**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DAWN BALL,** | : | **Civil No. 1:09-CV-773** |
| | : | |
| **Plaintiff,** | : | **(Chief Judge Kane)** |
| | : | |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **C.O. HILL, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

## REPORT AND RECOMMENDATION

### I.      Statement of Facts and of the Case

#### A.      Dawn Marie Ball's Litigation History

In many ways, Dawn Ball's current circumstances inspire continuing sorrow and concern.  Dawn Ball is an inmate housed in the Restricted Housing Unit at the State Correctional Institution (SCI) Muncy, who by her own account suffers from a cascading array of severe mental illnesses, and who has candidly acknowledged that she is profoundly disturbed.  Ball v. Beard, No. 1:09-CV-845 (Doc. 42, pp.6-7.) Furthermore, Ball is also an inmate who has revealed in multiple filings before this court that she has engaged in numerous episodes of destructive, self-defeating and senseless behavior.

1

Much of this institutional misconduct is marked by disturbing, excretory behavior. Indeed, a constant refrain throughout many of Ball's lawsuits is her fascination with her own bodily wastes. For example, recurring themes in Ball's lawsuits include Ball's penchant for smearing feces on herself, her clothes, her property, and her cell, as well as her destruction of her own clothing, and her use of her clothing to plug her toilet and flood her cell with water and human waste. In fact, this refrain is repeated in the instant case, where medical staff had to briefly delay one medical visit with the plaintiff because Ball had smeared her cell with human waste.

Ball is also, by her own admission, an inmate with a propensity for sudden, explosive rages, as illustrated by the civil complaint which she has filed Ball v. Barr, No.1:11-CV-2240 (M.D.Pa.). In this complaint, Ball describes an episode in which a discussion regarding the aesthetic qualities of a piece of cornbread escalated in a matter of moments into a profanity-laced wrestling match over a food tray.

Ball is a prodigious federal court litigant, bringing numerous lawsuits based upon her perception of the events that take place around her in prison. Indeed, at present Ball currently has more than 25 lawsuits pending before this court.[1] Ball is

---

[1]See, e.g., Ball v. SCI Muncy, No.1:08-CV-700 (M.D.Pa.); Ball v. SCI-Muncy, No. 1:08-CV-701 (M.D.Pa.); Ball v. Hill, No.1:09-CV-773 (M.D.Pa.); Ball v. Beard, No. 1:09-CV-845 (M.D.Pa.); Ball v. Lamas, No. 1:09-CV-846, (M.D. Pa.); Ball v. Oden, No 1:09-CV-847 (M.D.Pa.); Ball v. Bower, No. 1:10-CV-2561 (M.D.Pa.); Ball v. Sisley, No. 1:11-CV-877 (M.D.Pa.); Ball v. Struther,

also a prodigiously unsuccessful litigant, who has had at least three prior lawsuits

dismissed either as frivolous or on the grounds that the lawsuit failed to state a claim

upon which relief could be granted.

The history of repeated, frivolous and meritless litigation in federal court by

this plaintiff began in March of 2008, when Ball filed a complaint in the case of <u>Ball

v. SCI Muncy</u>, No. 1:08-CV-391 (M.D. Pa.).  On December 10, 2008, the district

court dismissed this civil action, citing Ball's failure to exhaust her administrative

remedies, and stating that Ball:

> does not dispute that she failed to exhaust her administrative remedies
> with regard to the issues raised in the complaint. Plaintiff's failure to
> oppose the remaining Defendants' motion, which also seeks dismissal
> for failure to exhaust administrative remedies, renders the motion
> unopposed. See L.R. 7.6. It is clear that Plaintiff's claims are not
> properly before this Court and must be dismissed.

(Doc. 36, p.5.)

---

No. 1:11-CV-1265 (M.D.Pa.); <u>Ball v. Hummel</u>, No. 1:11-CV-1422 (M.D.Pa.); <u>Ball
v. Beckley</u>, No. 1:11-CV-1829 (M.D.Pa.); <u>Ball v. Sipe</u>, No. 1:11-CV-1830
(M.D.Pa.); <u>Ball v. Craver</u>, No. 1:11-CV-1831 (M.D.Pa.); <u>Ball v. Powley</u>, No. 1:11-
CV-1832 (M..D.Pa.); <u>Ball v. Cooper</u>, No. 1:11-CV-1833 (M.D.Pa.); <u>Ball v.
Famiglio</u>, No. 1:11-CV-1834 (M.D.Pa.); <u>Ball v. Eckroth,</u> No. 1:11-CV-2238
(M.D.Pa.); <u>Ball v. Campbell</u>, No. 1:11-CV-2239 (M.D.Pa.); <u>Ball v Barr</u>, No. 1:11-
CV-2240 (M.D.Pa.); <u>Ball v Giroux,</u> No. 1:12-CV-10 (M.D.Pa.); <u>Ball v Giroux</u>,
No. 1:12-CV-11 (M.D.Pa.); <u>Ball v Curham</u>, No. 1:12-CV-12 (M.D.Pa.); <u>Ball v.
Giroux</u>, No. 1:12-CV-812 (M.D.Pa.); <u>Ball v. Giroux</u>, No. 1:12-CV-813 (M.D.Pa.);
<u>Ball v. Hummel</u>, No. 1:12-CV-814 (M.D.Pa.); <u>Ball v. D'Addio</u>, No. 1:12-CV-815
(M.D.Pa.).

3

While, fairly construed, the district court's dismissal decision rested on exhaustion grounds, and did not entail an analysis of the merits of Ball's claims, the dismissal order itself went on to state that any appeal of this dismissal would be "deemed frivolous and not in good faith."   Ball v. SCI Muncy, No. 1:08-CV-391 (M.D. Pa.) (Doc. 36, p.6.)

Nonetheless, Ball appealed this ruling.   (Doc. 37.)   On July 22, 2010, the United States Court of Appeals for the Third Circuit affirmed the dismissal of this action, noting that:

> The District Court granted the Defendants' motions to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6), on the grounds of failure to exhaust administrative remedies. We agree with the District Court's decision and accordingly affirm the dismissal of Ball's claims.

Ball v. SCI Muncy,  No. 1:08-CV-391 (M.D. Pa.)(Doc. 44, p. 2-3.)   Thus, the court of appeals' ruling, like the district court's decision, was expressly based upon Ball's failure to exhaust her administrative remedies.

On May 5, 2009, Ball filed a second civil action in the case of Ball v. Hartman, No. 1:09-CV-844 (M.D. Pa.).   This action was also dismissed by the district court, which on this occasion considered the merits of Ball's claims and explicitly concluded that Ball had failed to state a claim upon which relief could be granted. Ball v. Hartman, No. 1:09-CV-844 (M.D. Pa.) (Docs 32, 33, and 36.).   Therefore, this

second dismissal involved a merits analysis of Ball's claims, and a determination that Ball's complaint "fail[ed] to state a claim upon which relief may be granted." 28 U.S.C. § 1915(g). Ball appealed this dismissal order, <u>Ball v. Hartman</u>, No. 1:09-CV-844 (M.D. Pa.) (Doc 34.), but her appeal of this case was summarily denied by the court of appeals, <u>Ball v. Hartman</u>, No. 1:09-CV-844 (M.D. Pa.) (Docs 48.), and, on October29, 2010, this case was closed by the appellate court with the issuance of its mandate dismissing this appeal pursuant to 28 U.S.C. § 1915(e)(2)(B).[2]    <u>Ball v. Hartman</u>, No. 1:09-CV-844 (M.D. Pa.) (Doc. 48.).

Ball then filed yet another lawsuit in the case of <u>Ball v. Butts</u>, No. 1:11-CV-1068, (M.D.Pa.) on June 3, 2011. <u>Ball v. Butts,</u> No. 1:11-CV-1068 (M.D.Pa.)(Doc. 1.) On June 15, 2011, upon a screening review of this complaint, the district court dismissed this action for failure to state a claim upon which relief could be granted. <u>Ball v. Butts</u>, No. 1:11-CV-1068 (M.D.Pa.)(Doc. 8.). Ball appealed this dismissal. <u>Ball v. Butts</u>, No. 1:11-CV-1068 (M.D.Pa.)(Doc. 10.). On September 21, 2011, the court of appeals entered an opinion and order dismissing Ball's appeal as frivolous

_____

[2]28 U.S.C. § 1915(e)(2)(B)(i) provides that; "Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that . . . the action or appeal, . . . is frivolous or malicious." Thus the appellate court's October 29, 2010, ruling was tantamount to a declaration that this action was also frivolous.

pursuant to 28 U.S.C. § 1915(e)(2)(B).  That appellate court opinion and order spoke

unambiguously regarding the frivolous nature of this particular lawsuit filed by Ball,

stating in clear and precise terms that:

> Because we too have granted Ball leave to proceed IFP, we must screen this appeal to determine whether it is frivolous. See 28 U.S.C. § 1915(e)(2)(B)(I). An appeal is frivolous if it "lacks an arguable basis either in law or in fact." Neitzke v. Williams, 490 U.S. 319, 325 (1989).This appeal lacks any such basis. As the District Court adequately explained, immunity extends even to judicial acts that are "done maliciously," and Ball has alleged nothing suggesting that Judge Butts acted in the "clear absence of all jurisdiction." Gallas v. Supreme Court of Pa., 211 F.3d 760, 769 (3d Cir.2000) (citation and internal quotation marks omitted). To the extent that Ball's request for injunctive relief might not have been subject to dismissal under § 1915(e)(2)(B)(iii), it was subject to dismissal under § 1915(e)(2)(B)(ii) because such relief is not available against "a judicial officer for an act ... taken in such officer's judicial capacity" under these circumstances. 42 U.S.C. § 1983. Finally, we are satisfied that any amendment of Ball's complaint would be futile. See Grayson v. Mayview State Hosp., 293 F.3d 103, 111 (3d Cir.2002). Thus, we will dismiss this appeal.

Ball v. Butts, No. 11-2862,  2011 WL 4375782, 1 (3d Cir. Sept 21, 2011).

In addition to these dismissals, Ball currently has at least ten other cases[3] pending before this court where there have been reports and recommendations issued, or adopted, calling for dismissal of claims.

## B.    Ball's Current Lawsuit

### 1.    Factual Background

It is against the backdrop of this history of unsuccessful, unexhausted and meritless filings that Ball instituted the current lawsuit. Ball's present lawsuit relates, in part, to medical treatment which she received at SCI-Muncy during April 2009. (Doc. 1.)[4]  With respect to the medical defendants named in Ball's complaint, Ball's well-pleaded allegations are limited to four separate, discrete and specific episodes occurring on April 3, 7, 13 and 14, 2009, when Ball complains that she did not receive adequate medical care. (Id., p. 8.)

---

[3]Ball v. Beard, No. 1:09-CV-845 (M.D.Pa.); Ball v. Lamas, No. 1:09-CV-846, (M.D. Pa.); Ball v. Sisley, No. 1:11-CV-877 (M.D.Pa.); Ball v. Campbell, No. 1:11-CV-2239 (M.D.Pa.); Ball v Barr, No. 1:11-CV-2240 (M.D.Pa.); Ball v Giroux, No. 1:12-CV-10 (M.D.Pa.); Ball v Giroux, No. 1:12-CV-11 (M.D.Pa.); Ball v. Giroux, No. 1:12-CV-812 (M.D.Pa.); Ball v. Giroux, No. 1:12-CV-813 (M.D.Pa.);  Ball v. D'Addio, No. 1:12-CV-815 (M.D.Pa.).

[4]Ball's complaint also makes other allegations of assault against several correctional staff. These allegations, and the correctional defendants named in these allegations, are not before the court in the instant summary judgment motion.

Like all inmates, Ball has a legal obligation to exhaust available administrative remedies before proceeding to federal court.  While Ball alleged that these medical incidents took place between April 3 and 14, 2009, she filed her civil complaint on April 22, 2009, only 8 days after the last alleged medical event.  (Id.)  Ball alleged in her complaint that she had pursued administrative grievances relating to the matters set forth in the complaint, but the timing of her complaint as a legal and factual matter would have made it physically impossible for Ball to have fully exhausted her grievances as to these issues before she proceeded to federal court. (Id.)

With respect to these allegations, the undisputed facts can be simply stated:

## A.   <u>Exhaustion of Grievances</u>

The plaintiff, Dawn Ball is a state inmate housed at the SCI Muncy.  With respect to the matters set forth in this lawsuit, Ball has filed no administrative grievances regarding any of the allegations against the medical defendants set forth in this complaint. (Doc. 94, ¶¶30-54.)   Ball was, however, fully familiar with Department of Corrections grievance procedures in 2009, which required inmates to grieve dispute with prison officials, having filed numerous grievances in the past.

Specifically, pursuant to 37 Pa. C.S. § 93.9, the Department of Corrections maintains a grievance system, which is conducted in accordance with Administrative Directive DC-ADM 804, entitled "Inmate Grievance System."  DC-ADM 804

establishes procedures for review of inmate grievances and consists of a three-step process. <u>See</u> <u>Booth v. Churner</u>**,** 206 F.3d 289, 293, n. 2 (3d Cir. 2000). This three-step process requires an inmate to file an initial grievance (Step One), an appeal to the Superintendent (Step Two), and a final appeal (Step Three) to the Secretary's Office of Inmate Grievances and Appeals ("SOIGA"). To file an initial grievance, an inmate must submit to the Facility Grievance Coordinator a completed grievance form. <u>Id.</u> The inmate must specifically state any claims he or she wishes to make concerning violations of Department directives, regulations, court orders, or other law and state the relief sought. The grievance must be submitted within fifteen working days after the event in question. If the Grievance is denied, the inmate may appeal within ten days to the Facility Manager. If the inmate is dissatisfied with the decision of the Facility Manager, she may then appeal to SOIGA within fifteen days of the Facility Manager's decision.

In this case, with respect to the allegations leveled against the medical defendants Ball has alleged acts of neglect occurring on April 3, 7, 13 and 14, yet Ball filed her complaint only 8 days after the last alleged episode, on April 22, 2009. (Doc. 1.) As a matter both of law and fact, it would have been impossible for Ball to have fully grieved these episodes prior to proceeding to federal court given the time frame for grievance proceedings prescribed by prison regulations.

Nor can Ball allege at this time that prison officials unfairly refused her an opportunity to grieve these matters. Indeed, any such claim would be contradicted by Ball's complaint, which flatly stated that she had filed a grievance concerning these matters. (Doc. 1, p. 1, Sec. II A and B.) Moreover, the record affirmatively reveals that Ball filed a series of unrelated medical grievances during this period, thus demonstrating that she had access to the prison grievance process at the time of these events. (Doc. 94, ¶¶ 30-44.)

## B. <u>Medical Treatment</u>

Furthermore, as to Ball's complaints regarding her medical care in April, 2009, prison medical records reveal that Ball received on-going care and attention from health care providers during this period of time, even though she was often non-compliant with medical staff and occasionally engaged in self-destructive and harmful behavior.

These medical records also reflect that medical staff were proactively addressing Ball's presenting medical concerns during this period. Thus, on March 24, 2009, Dr. Donato ordered a physician assistant to follow up with Ball regarding a complaint concerning her finger. (Doc. 94, ¶ 5 Ex. 4, Physician's Orders.) On March 26, 2009, Physician Assistant Engel, in turn, examined Ball who was inquiring about lotion and treatment. (<u>Id</u>., ¶6, Ex. 5, Progress Notes.) However, even as Engel

provided this care to Ball, Engel's medical notes reflect that Ball was threatening and verbally abusive, compelling Engel to end the examination prematurely. (Id.) Despite Ball''s abusive behavior, Engel saw Ball the next day, March 27, 2009, and noted that the lotion Ball had requested was not indicated for her medical conditions. Accordingly, Engel advised Ball to sign up for sick call if needed further medical care. (Id., ¶8, Ex. 5).

Three days later, on March 30, 2009, Ball was sent to Dr. Famiglio for sick call but Ball refused to acknowledge Dr. Famiglio, and, therefore, could not be examined or evaluated. (Id., ¶9, Ex. 5, Progress Notes.) The following day, April 1, 2009, nursing notes indicated that Ball claimed she was assaulted by a corrections officer three days prior and was inquiring about being sent out for treatment. (Id., ¶10, Ex. 5, Progress Notes.) On April 2, 2009, nursing notes documented that Ball had spread feces all over her cell and that nurses were not permitted to assess Ball until she was moved to a clean cell. (Id., ¶11, Ex. 5, Progress Note of April 2, 2009.) Nursing staff then took a report of the alleged assault from Ball. (Id., ¶12, Ex. 5.)

The following day, April 3, 2009, Physician Assistant Engel saw Ball, who claimed she had been assaulted and complained of a bump on her head, requested a weight check, enhanced snack bag and bottom bunk/bottom tier status. (Id., ¶13, Ex. 5, Progress Notes.) Engel also noted that Ball was yelling, demanding, threatening

11

and was exhibiting manipulative behavior.  (Id., ¶14, Ex. 5, Progress Notes.)  Engel, therefore,  ordered that Ball be medically monitored while in RHU. (Id., ¶15, Ex. 5, Progress Notes.)  Later that day, nursing notes indicated that Ball was non-compliant and did not take her medication.  (Id., ¶16, Ex. 5, Progress Notes.)  Dr. Donato then ordered all medications to be briefly held until he could further assess Ball. (Id., ¶17, Ex. 4 at Physician Order of April 3, 2009.)

On April 4, 2009, Dr. Donato saw Ball due to Ball's complaints she was losing weight.  (Id., ¶18, Ex. 5, Progress Notes.)  Dr. Donato commenced a medical plan to check and monitor Ball's weight in order to ensure her health.  (Id., ¶19.)  As part of this plan, on April 7, 2009, Dr. Donato ordered a weight check for Ball and also that all medications be discontinued due to Ball's security risk.  (Id., ¶20, Ex. 4, Physician's Orders.)

Medical staff continued to closely monitor Ball's medication and nutrition throughout April 2009.  Thus, on April 8, 2009, Dr. Maue restarted one of Ball's medications.  (Id., ¶21, Ex. 4, Physician's Orders.)  On April 14, 2009, Physician Assistant Engel noted that Ball was requesting renewal of her snack bag but upon checking, noted that the snack bag was current through September 2009.  (Id., ¶22, Ex. 5, Progress Notes.)  The next day, Ball made the same request and Engel noted that she communicated to Ball that the snack bag order was current. (Id., ¶23, Ex. 5

at Progress Note of April 15, 2009.)  One week later, on April 22, 2009, Dr. Maue

discontinued one of Ball's medications.  (Id., ¶24, Ex. 4, Physician's Orders.)

As April drew to a close medical staff continued their efforts to care for Ball,

efforts that were hampered by Ball's own recalcitrance.  Thus, on April 27, 2009, Dr.

Famiglio was scheduled to see Ball on a sick call visit but Ball refused to

acknowledge him.  (Id., ¶25, Ex. 5, Progress Notes.)  The next day, Dr. Donato saw

Ball and noted that Ball was complaining of blurred vision and problems with her

glasses. (Id., ¶27, Ex. 5 at Progress Note of April 28, 2009.)  Dr. Donato promptly

addressed this concern and ordered an eye exam for Ball (Id. ¶28, Ex. 4 at Physician's

Order of April 28, 2009.)

## 2.    **Procedural History**

On the basis of these uncontested facts, the medical defendants, Drs. Famiglio

and Donato, as well as Physician Assistant Engel, moved for summary judgment in

their favor on July 3, 2012.  (Doc. 92.)  Ball has responded to this motion, (Doc.

99.), suggesting in part that the motion is not ripe because she has been

unreasonably denied access to legal materials.

Ball makes this allegation against the backdrop of repeated efforts by this

plaintiff over the past several months to avoid all of her litigation responsibilities.

Thus, on May 15, 2012, Ball sought to stay all of her multi-faceted federal court

litigation, in an apparent effort to delay or avoid rulings in these cases on many ripe defense motions.  (Doc. 85.)  On May 15, 2012, we denied this request made by Ball, noting that there was something profoundly inconsistent in these pleadings, since Ball's motions began with factual averments which detailed a series of allegedly improper actions by prison officials,  allegations which if true required immediate attention by the courts.  (Doc. 86.)  Yet, while Ball recited facts which cried out for action by the courts, she sought relief which would not be in her interests, or in the interests of justice:  a complete cessation of this litigation. (Id.) Because we believed that we owed it to Ball, and to all of the many defendants she has sued, to promptly address the merits of her claims, on May 15, 2012 we denied Ball's first motions to generally stay all of Ball's litigation to some future date of her choosing.  Instead, we instructed Ball in clear and precise terms as follows:

> In the meanwhile Ball is directed to continue to comply with the filing deadlines previously set by this court and IT IS ORDERED that any future requests for continuance or stay must be made individually by Ball in each of her cases along with factual averments specific to each particular case explaining why a stay or continuance is necessary.

(Id.)

Presented with this clear instruction from the court, Ball then chose to ignore this guidance and filed another global stay request in all of her cases.  (Doc. 89.) Indeed, in this second stay motion Ball endeavored not only to ignore the court's

prior order, but to try to ignore the court altogether by instructing the clerk's office to present these latest stay motions to another judge. (Id.) Furthermore, Ball's motion sought more than a stay of future litigation, she also demanded that all orders in all of her cases entered since April, 2012, be "revoked." (Id.) We denied this second stay motion as well, (Doc. 91.), but once again explained to Ball "that any requests for continuance or stay must be made individually by Ball in each of her cases along with factual averments specific to each particular case identifying the deadline she wishes to extend or stay, and explaining why a stay or continuance is necessary." (Id., p. 8.) Ball has, to date, refused to comply with this direction.

Moreover, the Department of Corrections has attested to the court that it is, in fact, providing Ball with access to her legal materials, allowing her to retain as many as 8 boxes of material in her cell at a time; requiring staff to work with her over two days in May 2012, to organize her legal documentation; retaining all of Ball's voluminous litigation records; providing her with pens, paper and postage at no cost; and permitting Ball on a bi-weekly basis to rotate litigation files into her cell to meet her new and on-going litigation needs. (Doc. 103.)

Given these representations, we find that this motion for summary judgment is now ripe for resolution. For the reasons set forth below, we recommend that the medical defendant's summary judgment motion be granted.

## II.    Discussion

## A.    Rule 56–The Legal Standard

The defendants have moved for judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Through summary adjudication a court is empowered to dispose of those claims that do not present a "genuine dispute as to any material fact," Fed. R. Civ. P. 56(a), and for which a trial would be "an empty and unnecessary formality." Univac Dental Co. v. Dentsply Int'l, Inc., No. 07-0493, 2010 U.S. Dist. LEXIS 31615, at *4 (M.D. Pa. Mar. 31, 2010).  The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party.  Id. at 248-49.

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact.  Conoshenti v. Pub.

Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004).  Once the moving party

has shown that there is an absence of evidence to support the nonmoving party's

claims, "the non-moving party must rebut the motion with facts in the record and

cannot rest solely on assertions made in the pleadings, legal memoranda, or oral

argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006);

accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  If the nonmoving party

"fails to make a showing sufficient to establish the existence of an element essential

to that party's case, and on which that party will bear the burden at trial," summary

judgment is appropriate.  Celotex, 477 U.S. at 322.  Summary judgment is also

appropriate if the non-moving party provides merely colorable, conclusory, or

speculative evidence.  Anderson, 477 U.S. at 249.  There must be more than a

scintilla of evidence supporting the nonmoving party and more than some

metaphysical doubt as to the material facts.  Id. at 252; see also, Matsushita Elec.

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In making this

determination, the court must "consider all evidence in the light most favorable to

the party opposing the motion." A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794

(3d Cir. 2007).

Moreover, a party who seeks to resist a summary judgment motion by citing

to disputed material issues of fact must show by competent evidence that such

factual disputes exist.  Moreover, a party who seeks to resist a summary judgment motion by citing to disputed material issues of fact must show by competent evidence that such factual disputes exist.  Further, "only evidence which is admissible at trial may be considered in ruling on a motion for summary judgment." Countryside Oil Co., Inc. v. Travelers Ins. Co., 928 F.Supp. 474, 482 (D.N.J.1995). This rule applies with particular force to parties who attempt to rely upon hearsay statements to establish material issues of fact which would preclude summary judgment.  With respect to such claims, it is well-settled that: "In this circuit, hearsay statements can be considered on a motion for summary judgment [only] if they are capable of admission at trial." Shelton v. University of Medicine & Dentistry of N.J., 223 F.3d 220, 223, n.2 (3d Cir. 2000), citing  Stelwagon Mfg. v. Tarmac Roofing Sys., Inc., 63 F.3d 1267, 1275, n.17 (3d Cir. 1995).  In this regard it has been aptly observed that:

> It is clear that when considering a motion for summary judgement, a court may only consider evidence which is admissible at trial, and that a party can not rely on hearsay evidence when opposing a motion for summary judgment. See Buttice v. G.D. Searle & Co., 938 F.Supp. 561 (E.D.Mo.1996). Additionally, a party must respond to a hearsay objection by demonstrating that the material would be admissible at trial under an exception to hearsay rule, or that the material is not hearsay. See Burgess v. Allstate Ins. Co., 334 F.Supp.2d 1351 (N.D.Ga.2003). The mere possibility that a hearsay statement will be admissible at trial, does not permit its consideration at the summary judgment stage. Henry v. Colonial Baking Co. of Dothan, 952 F.Supp.

744 (M.D.Ala.1996).

Bouriez v. Carnegie Mellon Univ., No. 02-2104, 2005 WL 2106582,* 9 (W.D.Pa. Aug. 26, 2005).  Thus, a party may not rely upon inadmissible hearsay assertions to avoid summary judgment.  Therefore, where a party simply presents inadmissible hearsay declarations in an attempt to establish a disputed material issue of fact, courts have typically rebuffed these efforts and held instead that summary judgment is appropriate.  See, e.g., Synthes v. Globus Medical, Inc., No. 04-1235, 2007 WL 2043184 (E.D.Pa. July 12, 2007); Bouriez v. Carnegie Mellon Univ., No. 02-2104, 2005 WL 2106582,* 9 (W.D.Pa. Aug. 26, 2005); Carpet Group Int'l v. Oriental Rug Importers Assoc., Inc., 256 F.Supp.2d 249 (D.N.J. 2003).

Similarly, it is well-settled that: "[o]ne cannot create an issue of fact merely by . . . denying averments . . . without producing any supporting evidence of the denials." Thimons v. PNC Bank, NA, 254 F.App'x 896, 899 (3d Cir. 2007)(citation omitted).  Thus, "[w]hen a motion for summary judgment is made and supported . . ., an adverse party may not rest upon mere allegations or denial." Fireman's Ins. Co. of Newark NJ v. DuFresne, 676 F.2d 965, 968 (3d Cir. 1982), see Sunshine Books, Ltd. v. Temple University, 697 F.2d 90, 96 (3d Cir. 1982)." [A] mere denial is insufficient to raise a disputed issue of fact, and an unsubstantiated doubt as to the veracity of the opposing affidavit is also not sufficient." Lockhart v. Hoenstine,

411 F.2d 455, 458 (3d Cir. 1969).  Furthermore, "a party resisting a [Rule 56]

motion cannot expect to rely merely upon bare assertions, conclusory allegations or

suspicions." <u>Gans v. Mundy</u>, 762 F.2d 338, 341 (3d Cir. 1985)(citing <u>Ness v.</u>

<u>Marshall</u>, 660 F.2d 517, 519 (3d Cir. 1981)).

Finally, a party who seeks to resist a summary judgment motion must also

comply with Local Rule 56.1, which specifically directs a party opposing a motion

for summary judgment to submit a "statement of the material facts, responding to

the numbered paragraphs set forth in the statement required [to be filed by the

movant], as to which it is contended that there exists a genuine issue to be tried";

if the nonmovant fails to do so, "[a]ll material facts set forth in the statement

required to be served by the moving party will be deemed to be admitted." L.R.

56.1.   Under the Local Rules, the failure to follow these instructions and

appropriately challenge the material facts tendered by the defendant means that

those facts must be deemed, since:

> A failure to file a counter-statement equates to an admission of all the
> facts set forth in the movant's statement. This Local Rule serves
> several purposes. First, it is designed to aid the Court in its
> determination of whether any genuine issue of material fact is in
> dispute. Second, it affixes the burden imposed by Federal Rule of Civil
> Procedure 56(e), as recognized in <u>Celotex Corp. v. Catrett</u>, on the
> nonmoving party 'to go beyond the pleadings and by her own
> affidavits, or by the depositions, answers to interrogatories, and
> admissions on file, *designated specific facts showing that there is a*

*genuine issue for trial*.' 477 U.S. 317, 324 (1986) (internal quotations omitted) (emphasis added).

Doe v. Winter, No. 04-CV-2170, 2007 U.S. Dist. LEXIS 25517, *2 n.2 (M.D. Pa.

Apr. 5, 2007) (parallel citations omitted; court's emphasis).

A party cannot evade these litigation responsibilities in this regard simply by

citing the fact that she is a *pro se* litigant.  These rules apply with equal force to all

parties.  See Sanders v. Beard, No. 09-CV-1384, 2010 U.S. Dist. LEXIS, *15 (M.D.

Pa. July 20, 2010) (*pro se* parties "are not excused from complying with court

orders and the local rules of court"); Thomas v. Norris, No. 02-CV-01854, 2006

U.S. Dist. LEXIS 64347, *11 (M.D. Pa. Sept. 8, 2006) (*pro se* parties must follow

the Federal Rules of Civil Procedure).  Therefore, Ball's failure to comply with

Local Rule 56.1 compels us to treat the failure to file a counter-statement as an

admission of all the facts set forth in the movant's statement.

## B.    The Prison Litigation Reform Act's Exhaustion Requirement

The defendants first urge the court to grant summary judgment on the

plaintiff's claims because Ball failed to fully exhaust the administrative remedies

available to her under Department of Corrections procedures.  In this case Ball's

alleged failure to timely pursue these administrative remedies may have substantive

significance for the plaintiff since the Prison Litigation Reform Act provides that

"[n]o action shall be brought with respect to prison conditions under . . . [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Section 1997e's exhaustion requirement applies to a wide-range of inmate complaints, including damages complaints like those made by Ball grounded in alleged violations of the Eighth Amendment. See Spruill v. Gillis, 372 F.3d 218 (3d Cir. 2004); Booth v. Churner, 206 F.3d 289 (3d Cir. 2000). While this exhaustion requirement is not a jurisdictional bar to litigation, this requirement is strictly enforced by the courts. This rigorous enforcement is mandated by a fundamental recognition that § 1997e's exhaustion requirement promotes important public policies. As the United States Court of Appeals for the Third Circuit has noted:

> Courts have recognized myriad policy considerations in favor of exhaustion requirements. They include (1) avoiding premature interruption of the administrative process and giving the agency a chance to discover and correct its own errors; (2) conserving scarce judicial resources, since the complaining party may be successful in vindicating his rights in the administrative process and the courts may never have to intervene; and (3) improving the efficacy of the administrative process. Each of these policies, which Congress seems to have had in mind in enacting the PLRA, is advanced by the across-the-board, mandatory exhaustion requirement in § 1997e(a). ... [A] a comprehensive exhaustion requirement better serves the policy of granting an agency the "opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court." Moreover, "even if the complaining prisoner seeks only money

damages, the prisoner may be successful in having the [prison] halt the infringing practice" or fashion some other remedy, such as returning personal property, reforming personal property policies, firing an abusive prison guard, or creating a better screening process for hiring such guards. And when a prisoner obtains some measure of affirmative relief, he may elect not to pursue his claim for damages. In either case, local actors are given the chance to address local problems, and at the very least, the time frame for the prisoner's damages is frozen or the isolated acts of abuse are prevented from recurring. An across-the-board exhaustion requirement also promotes judicial efficiency. . . . Moreover, even if only a small percentage of cases settle, the federal courts are saved the time normally spent hearing such actions and multiple appeals thereto. . . . In cases in which inmate-plaintiffs exhaust their remedies in the administrative process and continue to pursue their claims in federal court, there is still much to be gained. The administrative process can serve to create a record for subsequent proceedings, it can be used to help focus and clarify poorly pled or confusing claims, and it forces the prison to justify or explain its internal procedures. All of these functions help courts navigate the sea of prisoner litigation in a manner that affords a fair hearing to all claims.

Nyhuis v. Reno, 204 F.3d 65, 75-76 (3d Cir. 2000)(citations omitted).

Because of the important policies fostered by this exhaustion requirement, it has been held that there is no futility exception to § 1997e's exhaustion requirement. Id. Instead, courts have typically required across-the-board administrative exhaustion by inmate plaintiffs who seek to pursue claims in federal court.

Moreover, courts have also imposed a procedural default component on this exhaustion requirement, holding that inmates must fully satisfy the administrative requirements of the inmate grievance process before proceeding into federal court.

Spruill v. Gillis, 372 F.3d 218 (3d Cir. 2004).   Applying this procedural default

standard to § 1997e's exhaustion requirement, courts have concluded that inmates

who fail to fully, or timely, complete the prison grievance process are barred from

subsequently litigating claims in federal court.   See, e.g., Booth v. Churner, 206

F.3d 289 (3d Cir. 2000); Bolla v. Strickland, 304 F. App'x 22 (3d Cir. 2008); Jetter

v. Beard, 183 F. App'x 178 (3d Cir. 2006).

Furthermore, applying this  procedural default component to the exhaustion

requirement,  Spruill v. Gillis, 372 F.3d 218 (3d Cir. 2004), it has been held that:

> As for the failure to the identify named defendants on the grievance form, .
> . . to the extent the identity of a defendant was "a fact relevant to the claim,"
> Pennsylvania's prison grievance policy mandated that the identification be
> included in the inmate's statement of facts on the grievance form. And, . . .
> in the absence of any justifiable excuse, a Pennsylvania inmate's failure to
> properly identify a defendant constituted a failure to properly exhaust his
> administrative remedies under the  PLRA.

Williams v. Pennsylvania Dep't of Corrections, 146 F. App'x 554, 557(3d Cir.

2005).[5]  Thus, "it is clear, regardless of the purpose of the requirement, that Spruill

requires the prisoner-grievant-plaintiff to name in the grievance those he eventually

_____

[5]While the Williams decision is not precedential, it is highly persuasive as a
"paradigm of the legal analysis [this Court] should . . . follow."  Drinker v.
Colonial Sch. Dist., 78 F.3d 859, 864 n.12 (3d Cir. 1996). We find the reasoning
in Williams compelling, and recommend that this reasoning be extended to the
instant case.

sues, upon pain of procedural default." Hemingway v. Ellers, No. 07-1764, 2008 WL 3540526, *11 (M.D.Pa. Aug.12, 2008).

This broad rule favoring full exhaustion admits of one, narrowly defined exception. If the actions of prison officials directly caused the inmate's procedural default on a grievance, the inmate will not be held to strict compliance with this exhaustion requirement. See Camp v. Brennan, 219 F.3d 279 (3d Cir. 2000). However, case law recognizes a clear "reluctance to invoke equitable reasons to excuse [an inmate's] failure to exhaust as the statute requires." Davis v. Warman, 49 F. App'x 365, 368 (3d Cir. 2002). Thus, an inmate's failure to exhaust will only be excused "under certain limited circumstances", Harris v. Armstrong, 149 F. App'x 58, 59 (3d Cir. 2005), and an inmate can defeat a claim of failure to exhaust only by showing "he was misled or that there was some extraordinary reason he was prevented from complying with the statutory mandate." Davis v. Warman, supra, 49 F. App'x at 368. See also Brown v. Croak, 312 F.3d 109, 110 (3d Cir. 2002) (assuming that prisoner with failure to protect claim is entitled to rely on instruction by prison officials to wait for outcome of internal security investigation before filing grievance); Camp v. Brennan, 219 F.3d 279, 281 (3d Cir. 2000) (exhaustion requirement met where Office of Professional Responsibility fully examined merits

of excessive force claim and uncontradicted correctional officers impeded filing of grievance).

Furthermore, it is entirely clear that a claim that a prisoner was under a grievance restriction pursuant to DC-ADM 804, does not, by itself, excuse the failure to grieve this matter prior to filing suit in federal court, since those Corrections policies plainly allow inmates to file a limited number of grievances. Indeed, the United States Court of Appeals for the Third Circuit has rejected this precise argument in Cummings v. Crumb, 347 F. App'x 725, 727 (3d Cir. 2009), stating in that case that:

> [The inmate] also argued that he was denied the grievance process because he was on grievance restriction. According to the Pennsylvania Department of Corrections Grievance Policy DC-ADM 804 Part IV.L, an inmate on grievance restriction is restricted to filing no more than one grievance every 15 days. *Thus, being on grievance restriction would not have prevented [an inmate] from exhausting his remedies.*

Cummings v. Crumb, 347 F. App'x 725, 727 (3d Cir. 2009)(emphasis added).

In the absence of competent proof that an inmate was misled by corrections officials, or some other extraordinary circumstances, inmate requests to excuse a failure to exhaust are frequently rebuffed by the courts. Thus, an inmate cannot excuse a failure to timely comply with these grievance procedures by simply claiming that his efforts constituted "substantial compliance" with this statutory

exhaustion requirement.  Harris v. Armstrong, 149 F. App'x 58, 59 (3d Cir. 2005).

Nor can an inmate avoid this exhaustion requirement by merely alleging that the

Department of Corrections policies were not clearly explained to him.  Davis v.

Warman, 49 F. App'x 365, 368 (3d Cir. 2002).  Furthermore, an inmate's confusion

regarding these grievances procedures does not, standing alone, excuse a failure to

exhaust.  Casey v. Smith, 71 F. App'x 916 (3d Cir. 2003).  Moreover, an inmate

cannot cite to alleged staff impediments to grieving a matter as grounds for

excusing a failure to exhaust, if it also appears that the prisoner did not pursue a

proper grievance once those impediments were removed.  Oliver v. Moore, 145 F.

App'x 731 (3d Cir. 2005)(failure to exhaust not excused if, after staff allegedly

ceased efforts to impede grievance, prisoner failed to follow through on grievance).

Thus, in this setting, the Prison Litigation Reform Act requires that an inmate

fully exhaust her administrative remedies before proceeding into federal court, an

administrative exhaustion requirement which entails full compliance with state

grievance procedures and timelines, as well as the basic requisite that the inmate

identify those against whom she has a grievance during the administrative process

before she may name these individuals as defendants in a federal lawsuit.

### C.   Ball Has Failed to Properly Exhaust Her Administrative Remedies

Judged against these guideposts, we find that the medical defendants are entitled to summary judgment in their favor on the grounds that Ball has failed to satisfy the PLRA's administrative exhaustion requirement. In this case, with respect to the medical matters set forth in her complaint, it is entirely undisputed that Ball has never exhausted her administrative remedies.  Indeed, it would have been entirely impossible for Ball to have completed the exhaustion process mandated by the PLRA with respect to these allegations.  With regard to the allegations Ball has made against these medical defendants, Ball has alleged acts of neglect occurring on April 3, 7, 13 and 14, yet Ball filed her complaint only 8 days after the last alleged episode, on April 22, 2009.  (Doc. 1.)  As a matter both of law and fact, it would have been impossible for Ball to have fully grieved these episodes in 8 days prior to proceeding to federal court, given the time frame for grievance proceedings prescribed by prison regulations.

Nor can Ball allege at this time that prison officials unfairly refused her an opportunity to grieve these matters.  Indeed, any such claim would be contradicted by Ball's complaint, which flatly stated that she had filed a grievance concerning these matters.  (Doc. 1, p. 1, Sec. II A and B.)  Moreover, the record affirmatively reveals that Ball filed a series of unrelated medical grievances during this period,

thus demonstrating that she had access to the prison grievance process at the time

of these events.  (Doc. 94, ¶¶ 30-44.)  Thus, we find that Ball has failed to carry her

burden of proving "that there was some extraordinary reason [s]he was prevented

from complying with the statutory mandate."  Davis v. Warman, supra, 49 F. App'x

at 368.  On these facts, which are entirely undisputed, it is clear that Ball had ample

opportunity to comply with the requirements of the PLRA by fully grieving these

matters.  Her failure to do so, therefore, is both unexcused, and inexcusable, and

compels dismissal of this case.

### D.    Ball Has Failed To State an Eighth Amendment Deliberate Indifference Claim

Finally, Ball has alleged that prison care-givers displayed deliberate

indifference to her medical needs on four days in April 2009 in a fashion which

constituted cruel and unusual punishment in violation of the Eighth Amendment to

the United States Constitution.  Ball faces an exacting burden in advancing this

Eighth Amendment claim against prison medical staff in their individual capacities.

To sustain such a claim, Ball must:

> [M]eet two requirements: (1) "the deprivation alleged must be, objectively, sufficiently serious;" and (2) the "prison official must have a sufficiently culpable state of mind." Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quotation marks and citations omitted). In prison conditions cases, "that state of mind is one of 'deliberate indifference' to inmate health or safety." Id.

> "Deliberate indifference" is a subjective standard under Farmer-the prison official-defendant must actually have known or been aware of the excessive risk to inmate safety.

Beers-Capitol v. Whetzel,256 F.3d 120, 125 (3d Cir. 2001).

By including a subjective intent component in this Eighth Amendment benchmark, the courts have held that a mere generalized knowledge that prisons are dangerous places does not give rise to an Eighth Amendment claim. See Jones v. Beard, 145 F. App'x 743 (3d Cir. 2005)(finding no Eighth Amendment violation where inmate-plaintiff complained about cellmate who had a history of psychological problems, but where plaintiff failed to articulate a specific threat of harm during the weeks prior to an attack.) In short, when "analyzing deliberate indifference, a court must determine whether the prison official 'acted or failed to act despite his knowledge of a substantial risk of serious harm.' Farmer v. Brennan, 511 U.S. 825, 841 (1994). A prisoner plaintiff must prove that the prison official 'knows of and disregards an excessive risk to inmate health or safety.' Id. at 837." Garvey v. Martinez, 08-2217, 2010 WL 569852, at *6 (M.D.Pa. Feb. 11, 2010).

These principles apply with particular force to Eighth Amendment claims premised upon inadequate medical care. In the medical context, a constitutional violation under the Eighth Amendment occurs only when state officials are deliberately indifferent to an inmate's serious medical needs. Estelle v. Gamble, 429

U.S. 97, 105 (1976).  To establish a violation of his constitutional right to adequate medical care in accordance with this standard, Ball is required to allege facts that demonstrates (1) a serious medical need, and (2) acts or omissions by prison officials that indicate deliberate indifference to that need.  Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999).

Deliberate indifference to a serious medical need involves the "unnecessary and wanton infliction of pain." Estelle, 429 U.S. at 104.  Such indifference may be evidenced by an intentional refusal to provide care, delayed provision of medical treatment for non-medical reasons, denial of prescribed medical treatment, denial of reasonable requests for treatment that results in suffering or risk of injury, Durmer v. O'Carroll, 991 F.2d 64, 68 (3d Cir. 1993), or "persistent conduct in the face of resultant pain and risk of permanent injury," White v. Napoleon, 897 F.2d 103, 109 (3d Cir. 1990).

However, it is also clear that the mere misdiagnosis of a condition or medical need, or negligent treatment provided for a condition, is not actionable as an Eighth Amendment claim because medical malpractice standing alone is not a constitutional violation. Estelle, 429 U.S. at 106.  "Indeed, prison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners." Durmer, 991 F.2d at 67 (citations omitted).  Furthermore, in a prison medical context, deliberate indifference is generally not found when some significant level

of medical care has been offered to the inmate.  Clark v. Doe, 2000 U.S. Dist. LEXIS 14999, 2000 WL 1522855, at *2 (E.D.Pa. Oct. 13, 2000)("courts have consistently rejected Eighth Amendment claims where an inmate has received some level of medical care").  Thus, such complaints fail as constitutional claims under § 1983 since "the exercise by a doctor of his professional judgment is never deliberate indifference.  See e.g. Brown v. Borough of Chambersburg, 903 F.2d 274, 278 (3d Cir.1990) ('[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights.')".  Gindraw v. Dendler, 967 F.Supp. 833, 836 (E.D. Pa. 1997).

Applying this exacting standard, courts have frequently rejected Eighth Amendment claims that are based upon the level of professional care that an inmate received; see, e.g., Ham v. Greer, 269 F. App'x 149 (3d Cir. 2008); James v. Dep't of Corrections, 230 F. App'x 195 (3d. Cir. 2007); Gillespie v. Hogan, 182 F. App'x 103 (3d Cir. 2006); Bronson v. White, No. 05-2150, 2007 WL 3033865 (M.D. Pa. Oct. 15, 2007); Gindraw v. Dendler, 967 F.Supp. 833 (E.D. Pa. 1997), particularly where it can be shown that significant medical services were provided to the inmate but the prisoner is dissatisfied with the outcome of these services.  Instead, courts have defined the precise burden which an inmate must sustain in order to advance an Eighth Amendment claim against a healthcare professional premised on allegedly inadequate care, stating that:

The district court [may] properly dis[miss an] Eighth Amendment claim, as it concerned [a care giver], because [the] allegations merely amounted to a disagreement over the proper course of his treatment and thus failed to allege a reckless disregard with respect to his . . . care. The standard for cruel and unusual punishment under the Eighth Amendment, established by the Supreme Court in Estelle v. Gamble, 429 U.S. 97, 104 (1976), and its progeny, has two prongs: 1) deliberate indifference by prison officials and 2) serious medical needs. "It is well-settled that claims of negligence or medical malpractice, without some more culpable state of mind, do not constitute 'deliberate indifference.' " "Nor does mere disagreement as to the proper medical treatment support a claim of an eighth amendment violation." . . . . [The inmate] alleged no undue delay in receiving treatment and, as the district court noted, the evidence he presented established that he received timely care . . . . Although [an inmate plaintiff] may have preferred a different course of treatment, [t]his preference alone cannot establish deliberate indifference as such second-guessing is not the province of the courts.

James, 230 F.App'x. at 197-198.(citations omitted).

Furthermore, it is well-settled that an inmate's dissatisfaction with a course of medical treatment, standing alone, does not give rise to a viable Eighth Amendment claim. See Taylor v. Norris, 36 F. App'x 228, 229 (8th Cir. 2002) (deliberate indifference claim failed when it boiled down to a disagreement over recommended treatment for hernias and decision not to schedule a doctor's appointment); Abdul-Wadood v. Nathan, 91 F.3d 1023, 1024-35 (7th Cir.1996) (inmate's disagreement with selection of medicine and therapy for sickle cell anemia falls well short of demonstrating deliberate indifference); Sherrer v. Stephen, 50 F.3d 496, 497 (8th Cir.1994) (inmate's "desire for a replacement joint instead of

fusion surgery is merely a disagreement with the course of medical treatment and does not state a constitutional claim"); Smith v. Marcantonio, 910 F.2d 500, 502 (8th Cir.1990) (inmate failed to prove deliberate indifference where his complaints represented nothing more than mere disagreement with course of his medical treatment).   Therefore, where a dispute in essence entails nothing more than a disagreement between an inmate and care-givers over alternate treatment plans, the inmate's complaint will fail as a constitutional claim; see e.g., Gause v. Diguglielmo, 339 F. App'x 132 (3d Cir. 2009)(dispute over choice of medication does not rise to the level of an Eighth Amendment violation); Innis v. Wilson, 334 F. App'x 454 (3d Cir. 2009)(same); Rozzelle v. Rossi, 307 F. App'x 640 (3d Cir. 2008)(same); Whooten v. Bussanich, 248 F. App'x 324 (3d Cir. 2007)(same); Ascenzi v. Diaz, 247 F. App'x 390 (3d Cir. 2007)(same), since "the exercise . . . of . . . professional judgment is never deliberate indifference." Gindraw v. Dendler, 967 F.Supp. 833, 836 (E.D. Pa. 1997)(citations omitted).

Judged against these standards, Ball cannot sustain an Eighth Amendment deliberate indifference claim against the medical defendants in this case arising out of her care and treatment in April 2009.  Indeed, in this case it is entirely undisputed that the plaintiff received ongoing care and treatment from prison medical staff throughout the month of April, despite both her truculent refusals to cooperate with medical personnel, and an April 2, 2009, episode where she soiled her cell with

feces, self-destructive acts by Ball that briefly delayed her treatment until a new cell, which was not smeared with human waste, could be arranged for the plaintiff.

All of this on-going care is undisputed in the medical record, and is fatal to Ball's claim that staff were deliberately indifferent to her medical needs in April 2009.  Thus, in its present posture, Ball's Eighth Amendment claims should be dismissed since those:

> [A]llegations merely amounted to a disagreement over the proper course of his treatment and thus failed to allege a reckless disregard with respect to his  . . . care. The standard for cruel and unusual punishment under the Eighth Amendment, established by the Supreme Court in Estelle v. Gamble, 429 U.S. 97, 104 (1976), and its progeny, has two prongs: 1) deliberate indifference by prison officials and 2) serious medical needs. "It is well-settled that claims of negligence or medical malpractice, without some more culpable state of mind, do not constitute 'deliberate indifference.' " "Nor does mere disagreement as to the proper medical treatment support a claim of an eighth amendment violation." . . . . [The inmate] alleged no undue delay in receiving treatment and, as the district court noted, the evidence he presented established that he received timely care . . . . Although [an inmate plaintiff] may have preferred a different course of treatment, [t]his preference alone cannot establish deliberate indifference as such second-guessing is not the province of the courts.

James, 230 F.App'x. at 197-198.(citations omitted).

## F.    The Defendants Are Entitled to Qualified Immunity

Finally,  we find that, even if Ball had stated a colorable claim for any actions relating to her medical care, the defendants would nevertheless be entitled to qualified immunity from these claims for damages.   In order to establish a civil

rights claim Ball must show the deprivation of a right secured by the United States Constitution or the laws of the United States.  Satisfying these elements alone, however, does not guarantee that Ball is entitled to recover damages from these public officials.  Government officials performing "discretionary functions," are insulated from suit if their conduct did not violate a "clearly established statutory or constitutional right[] of which a reasonable person would have known."  Wilson v. Layne, 526 U.S. 603, 609 (1999); see also Pearson v. Callahan, 555 U.S. 223 (2009).  This doctrine, known as qualified immunity, provides officials performing discretionary functions not only defense to liability, but also "immunity from suit." Crouse v. S. Lebanon Twp., 668 F. Supp. 2d 664, 671 (M.D. Pa. 2009) (Conner, J.) (citations omitted).  Qualified immunity:

> balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.  The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."

Pearson, 555 U.S. at 231.

Determinations regarding qualified immunity, and its application in a given case, require a court to undertake two distinct inquiries.  First, the court must evaluate whether the defendant violated a constitutional right.  Saucier v. Katz, 533

U.S. 194, 201-02 (2001), abrogated in part by <u>Pearson</u>,555 U.S. 223; <u>Curley v. Klem</u>, 499 F.3d 199, 206 (3d Cir. 2007); <u>Williams v. Bitner</u>, 45/5 F.3d 186, 190 (3d Cir. 2006). If the defendant did not actually commit a constitutional violation, then the court must find in the defendant's favor. <u>Saucier</u>, 533 U.S. at 201. If the defendant is found to have committed a constitutional violation, the court must undertake a second, related inquiry to assess whether the constitutional right in question was "clearly established" at the time the defendant acted. <u>Pearson</u>, 555 U.S. 231-32; <u>Saucier</u>, 533 U.S. at 201-02. The Supreme Court has instructed that a right is clearly established for purposes of qualified immunity if a reasonable state actor under the circumstances would understand that his conduct violates that right. <u>Williams</u>, 455 F.3d at 191 (citing <u>Saucier</u>, 533 U.S. at 202).

In order to find that a right is clearly established, "the right allegedly violated must be defined at the appropriate level of specificity." <u>Wilson</u>, 526 U.S. at 615. The Supreme Court has explained that, at least in some cases, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful." <u>Hope v. Pelzer</u>, 536 U.S. 730, 741 (2002) (quoting <u>United States v. Lanier</u>, 520 U.S. 259, 271 (1997) (internal quotation marks and citation omitted)). In some cases, "officials can still be on notice that

their conduct violates established law even in novel factual circumstances." Wilson, 455 F.3d at 191 (quoting Hope, 536 U.S. at 741).

The court is no longer required to conduct these two inquiries sequentially, Pearson, 555 U.S. at 236, and it may forego difficult constitutional issues and award qualified immunity to a defendant if it is apparent that the defendant did not violate rights that were clearly established at the time the defendant acted. Id. Where a court elects to address the alleged constitutional violations, however, the court's analysis of the merits for purposes of summary judgment merges with analysis of the deprivation of federal rights for purposes of qualified immunity. Gruenke v. Seip, 225 F.3d 290, 299-300 (3d Cir. 2000); Crouse, 668 F. Supp. 2d at 671; see also Grant v. City of Pittsburgh, 98 F.3d 116, 122 (3d Cir. 1996) ("[C]rucial to the resolution of [the] assertion of qualified immunity is a careful examination of the record . . . to establish . . . a detailed factual description of the actions of each individual defendant (viewed in a light most favorable to the plaintiff).") Because qualified immunity entails a consideration of whether the law was clearly established at the time of a defendant's conduct, this defense, which focuses on the state of the law, presents a question of law for the court, and one which can often be resolved on summary judgment. See Montanez v. Thompson, 603 F.3d 243 (3d Cir. 2010).

In this case, case law has repeatedly rejected inmate Eighth Amendment challenges to medical care, finding no deliberate indifference to serious medical needs where it is shown that the prisoner received on-going care and treatment. See, e.g., Lasko v. Watts, 373 F. App'x 196, 203 (3d Cir. 2010); Hodge v. U.S. Department of Justice, 2010 WL 1141387 (3d Cir. Aug. 2, 2010); Palmer v. Carroll, 640 F.Supp 2d. 542 (D.Del. 2009); Moshier v. United States, No. 05-180, 2007 WL 1703536 (W.D. Pa. June 11, 2007); Jordan v. Delaware, 433 F.Supp.2d. 433 (D.Del. 2006); Christy v. Robinson, 216 F.Supp.2d 398, 413 (D.N.J. 2002). Federal courts have also routinely held that medical disputes between physicians and prisoners over alternate treatment plans do not state an Eighth Amendment claim. See, e.g., Rodriguez v. Secretary Pennsylvania Dep't of Corrections, No. 10-3134, 2011 WL 3555424 (3d Cir. Aug. 12, 2011); Winslow v. Prison Heath Service, 406 F.App'x 671 (3d Cir. 2011); Guiddy v. Terhune, 90 F.App'x 592 (3d Cir. 2004). These principles apply with particular force to an inmate, like Ball, who insists on indulging in un-hygienic behavior. See Banks v. Mozingo, 423 F.App'x 123 (3d Cir. 2011)(denying inmate hygiene complaint as ironic where inmate engaged in un-hygienic behavior, including smearing feces on cell).

Given the state of the law in this field, which has consistently rebuffed inmate Eighth Amendment challenges like those presented here by Ball, the defendants simply could not have recognized that their actions would violate "clearly

established statutory or constitutional right[] of which a reasonable person would have known." Wilson v. Layne, 526 U.S. 603, 609 (1999).   Therefore, the defendants are entitled to qualified immunity on these claims.[6]

## III.  Conclusion

Accordingly, for the forgoing reasons, the medical IT IS RECOMMENDED that defendants' motion for summary judgment be GRANTED, and the plaintiff's claims against defendants Famiglio, Engel and Donato should be DISMISSED.

The Parties are further placed on notice that pursuant to Local Rule 72.3:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified  proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or

---

[6]    While the defendants have not separately argued qualified immunity in this motion, they have raised this defense in their answer to Ball's complaint, and this court is entitled to address this defense *sua sponte*, when appropriate. See Doe v. Delie, 257 F.3d 309 (3d Cir. 2001) (affirming *sua sponte* recommendation of qualified immunity by U.S. magistrate judge

where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 9th day of August 2012.

**_S/MARTIN C. CARLSON_**

Martin C. Carlson

United States Magistrate Judge