**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DAWN BALL, | : | Civil No. 1:09-CV-773 |
| | : | |
| Plaintiff, | : | (Chief Judge Kane) |
| | : | |
| v. | : | |
| | : | (Magistrate Judge Carlson) |
| C.O. HILL, et al., | : | |
| | : | |
| Defendants. | : | |

## REPORT AND RECOMMENDATION

### I.    Statement of Facts and of the Case

#### A.    Dawn Marie Ball's Litigation History

In many ways, Dawn Ball's current circumstances inspire a profound and continuing sense of sorrow and concern. Dawn Ball is an inmate housed in the Restricted Housing Unit at the State Correctional Institution (SCI) Muncy, who by her own account suffers from a cascading array of severe mental illnesses, and who has candidly acknowledged that she is profoundly disturbed. Ball v. Beard, No. 1:09-CV-845 (Doc. 42, pp.6-7).  Furthermore, Ball is also an inmate who has revealed in multiple filings before this  court that she has engaged in numerous episodes of destructive, self-defeating and senseless behavior.

Much of this institutional misconduct is marked by disturbing, excretory behavior. Indeed, a constant refrain throughout many of Ball's lawsuits is her fascination with her own bodily wastes. For example, recurring themes in Ball's lawsuits include Ball's penchant for smearing feces on herself, her clothes, her property, and her cell, as well as her destruction of her own clothing, and her use of her clothing to plug her toilet and flood her cell with water and human waste. In fact, this refrain is repeated in the instant case, where medical staff had to briefly delay one medical visit with the plaintiff because Ball had smeared her cell with human waste.

Ball is also, by her own admission, an inmate with a propensity for sudden, explosive rages, as illustrated by the civil complaint which she has filed <u>Ball v. Barr</u>, No.1:11-CV-2240 (M.D.Pa.). In this complaint, Ball describes an episode in which a discussion regarding the aesthetic qualities of a piece of cornbread escalated in a matter of moments into a profanity-laced wrestling match over a food tray.

Ball is a prodigious federal court litigant, bringing numerous lawsuits based upon her perception of the events that take place around her in prison. Indeed, at present Ball currently has more than 25 lawsuits pending before this court.[1] Ball is

---

[1]<u>See, e.g.</u>, <u>Ball v. SCI Muncy</u>, No.1:08-CV-700 (M.D.Pa.); <u>Ball v. SCI-Muncy</u>, No. 1:08-CV-701 (M.D.Pa.); <u>Ball v. Hill</u>, No.1:09-CV-773 (M.D.Pa.); <u>Ball v. Beard</u>, No. 1:09-CV-845 (M.D.Pa.); <u>Ball v. Lamas</u>, No. 1:09-CV-846, (M.D. Pa.); <u>Ball v. Oden</u> , No 1:09-CV-847 (M.D.Pa.); <u>Ball v. Bower</u>, No. 1:10-CV-2561 (M.D.Pa.); <u>Ball v. Sisley</u>, No. 1:11-CV-877 (M.D.Pa.); <u>Ball v. Struther</u>,

also a prodigiously unsuccessful litigant, who has had at least three prior lawsuits dismissed either as frivolous or on the grounds that the lawsuit failed to state a claim upon which relief could be granted.

The history of repeated, frivolous and meritless litigation in federal court by this plaintiff began in March of 2008, when Ball filed a complaint in the case of <u>Ball v. SCI Muncy</u>, No. 1:08-CV-391 (M.D. Pa.). On December 10, 2008, the district court dismissed this civil action, citing Ball's failure to exhaust her administrative remedies, and stating that Ball:

> does not dispute that she failed to exhaust her administrative remedies with regard to the issues raised in the complaint. Plaintiff's failure to oppose the remaining Defendants' motion, which also seeks dismissal for failure to exhaust administrative remedies, renders the motion unopposed. See L.R. 7.6. It is clear that Plaintiff's claims are not properly before this Court and must be dismissed.

(Doc. 36, p.5.)

---

No. 1:11-CV-1265 (M.D.Pa.); <u>Ball v. Hummel</u>, No. 1:11-CV-1422 (M.D.Pa.); <u>Ball v. Beckley</u>, No. 1:11-CV-1829 (M.D.Pa.); <u>Ball v. Sipe</u>, No. 1:11-CV-1830 (M.D.Pa.); <u>Ball v. Craver</u>, No. 1:11-CV-1831 (M.D.Pa.); <u>Ball v. Powley</u>, No. 1:11-CV-1832 (M..D.Pa.); <u>Ball v. Cooper</u>, No. 1:11-CV-1833 (M.D.Pa.); <u>Ball v. Famiglio</u>, No. 1:11-CV-1834 (M.D.Pa.); <u>Ball v. Eckroth,</u> No. 1:11-CV-2238 (M.D.Pa.); <u>Ball v. Campbell</u>, No. 1:11-CV-2239 (M.D.Pa.); <u>Ball v Barr</u>, No. 1:11-CV-2240 (M.D.Pa.); <u>Ball v Giroux,</u> No. 1:12-CV-10 (M.D.Pa.); <u>Ball v Giroux</u>, No. 1:12-CV-11 (M.D.Pa.); <u>Ball v Curham</u>, No. 1:12-CV-12 (M.D.Pa.); <u>Ball v. Giroux</u>, No. 1:12-CV-812 (M.D.Pa.); <u>Ball v. Giroux</u>, No. 1:12-CV-813 (M.D.Pa.); <u>Ball v. Hummel</u>, No. 1:12-CV-814 (M.D.Pa.); <u>Ball v. D'Addio</u>, No. 1:12-CV-815 (M.D.Pa.).

While, fairly construed, the district court's dismissal decision rested on exhaustion grounds, and did not entail an analysis of the merits of Ball's claims, the dismissal order itself went on to state that any appeal of this dismissal would be "deemed frivolous and not in good faith." Ball v. SCI Muncy, No. 1:08-CV-391 (M.D. Pa.) (Doc. 36, p.6.)

Nonetheless, Ball appealed this ruling. (Doc. 37.) On July 22, 2010, the United States Court of Appeals for the Third Circuit affirmed the dismissal of this action, noting that:

> The District Court granted the Defendants' motions to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6), on the grounds of failure to exhaust administrative remedies. We agree with the District Court's decision and accordingly affirm the dismissal of Ball's claims.

Ball v. SCI Muncy, No. 1:08-CV-391 (M.D. Pa.)(Doc. 44, p. 2-3). Thus, the court of appeals' ruling, like the district court's decision, was expressly based upon Ball's failure to exhaust her administrative remedies.

On May 5, 2009, Ball filed a second civil action in the case of Ball v. Hartman, No. 1:09-CV-844 (M.D. Pa.). This action was also dismissed by the district court, which on this occasion considered the merits of Ball's claims and explicitly concluded that Ball had failed to state a claim upon which relief could be granted. Ball v. Hartman, No. 1:09-CV-844 (M.D. Pa.) (Docs 32, 33, and 36). Therefore, this

second dismissal involved a merits analysis of Ball's claims, and a determination that Ball's complaint "fail[ed] to state a claim upon which relief may be granted." 28 U.S.C. § 1915(g). Ball appealed this dismissal order, <u>Ball v. Hartman</u>, No. 1:09-CV-844 (M.D. Pa.) (Doc. 34.), but her appeal of this case was summarily denied by the court of appeals, <u>Ball v. Hartman</u>, No. 1:09-CV-844 (M.D. Pa.) (Doc. 48.), and, on October 29, 2010, this case was closed by the appellate court with the issuance of its mandate dismissing this appeal pursuant to 28 U.S.C. § 1915(e)(2)(B).[2] <u>Ball v. Hartman</u>, No. 1:09-CV-844 (M.D. Pa.) (Doc. 48).

Ball then filed yet another lawsuit in the case of <u>Ball v. Butts</u>, No. 1:11-CV-1068, (M.D.Pa.) on June 3, 2011. <u>Ball v. Butts</u>, No. 1:11-CV-1068 (M.D.Pa.)(Doc. 1.) On June 15, 2011, upon a screening review of this complaint, the district court dismissed this action for failure to state a claim upon which relief could be granted. <u>Ball v. Butts</u>, No. 1:11-CV-1068 (M.D.Pa.)(Doc. 8.). Ball appealed this dismissal. <u>Ball v. Butts</u>, No. 1:11-CV-1068 (M.D.Pa.)(Doc. 10.). On September 21, 2011, the court of appeals entered an opinion and order dismissing Ball's appeal as frivolous

---

[2] 28 U.S.C. § 1915(e)(2)(B)(I) provides that; "Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that . . . the action or appeal, . . . is frivolous or malicious." Thus the appellate court's October 29, 2010 ruling was tantamount to a declaration that this action was also frivolous.

pursuant to 28 U.S.C. § 1915(e)(2)(B).  That appellate court opinion and order spoke

unambiguously regarding the frivolous nature of this particular lawsuit filed by Ball,

stating in clear and precise terms that:

> Because we too have granted Ball leave to proceed IFP, we must screen this appeal to determine whether it is frivolous. See 28 U.S.C. § 1915(e)(2)(B)(I). An appeal is frivolous if it "lacks an arguable basis either in law or in fact." Neitzke v. Williams, 490 U.S. 319, 325 (1989).This appeal lacks any such basis. As the District Court adequately explained, immunity extends even to judicial acts that are "done maliciously," and Ball has alleged nothing suggesting that Judge Butts acted in the "clear absence of all jurisdiction." Gallas v. Supreme Court of Pa., 211 F.3d 760, 769 (3d Cir.2000) (citation and internal quotation marks omitted). To the extent that Ball's request for injunctive relief might not have been subject to dismissal under § 1915(e)(2)(B)(iii), it was subject to dismissal under § 1915(e)(2)(B)(ii) because such relief is not available against "a judicial officer for an act ... taken in such officer's judicial capacity" under these circumstances. 42 U.S.C. § 1983.  Finally, we are satisfied that any amendment of Ball's complaint would be futile.  See Grayson v. Mayview State Hosp., 293 F.3d 103, 111 (3d Cir.2002).  Thus, we will dismiss this appeal.

Ball v. Butts, No. 11-2862,  2011 WL 4375782, 1 (3d Cir. Sept 21, 2011).

In addition to these dismissals, Ball has at least ten other cases[3] pending before this court where there have been reports and recommendations issued, or adopted, calling for dismissal of claims.

## B.    Ball's Current Lawsuit

### 1.    Factual Background

It is against the backdrop of this history of unsuccessful, unexhausted and meritless filings that Ball instituted the current lawsuit. Ball's present lawsuit relates, in part, to what she alleges were episodes involving alleged confiscation of her property, denial of access to the courts, and use of excessive force against Ball by various prison staff. (Doc. 1.) With respect to the correctional defendants, Ball's well-pleaded allegations are limited to episodes occurring during a 22-day period between March 20, 2009 and April 13, 2009.

Like all inmates, Ball has a legal obligation to exhaust available administrative remedies before proceeding to federal court. While Ball alleged that these incidents took place between March 20 and April 13, 2009, she filed her civil complaint on

---

[3]Ball v. Beard, No. 1:09-CV-845 (M.D.Pa.); Ball v. Lamas, No. 1:09-CV-846, (M.D. Pa.); Ball v. Sisley, No. 1:11-CV-877 (M.D.Pa.); Ball v. Campbell, No. 1:11-CV-2239 (M.D.Pa.); Ball v Barr, No. 1:11-CV-2240 (M.D.Pa.); Ball v Giroux, No. 1:12-CV-10 (M.D.Pa.);Ball v Giroux, No. 1:12-CV-11 (M.D.Pa.); Ball v. Giroux, No. 1:12-CV-812 (M.D.Pa.); Ball v. Giroux, No. 1:12-CV-813 (M.D.Pa.);  Ball v. D'Addio, No. 1:12-CV-815 (M.D.Pa.).

April 22, 2009, only 9 days after the last alleged event. (Id.) Ball alleged in her complaint that she had fully pursued and exhausted her administrative grievances relating to the matters set forth in the complaint, but the timing of her complaint demonstrates that this representation is false. As a legal and factual matter would have been physically impossible for Ball to have fully exhausted her grievances as to these issues before she proceeded to federal court. (Id.)

With respect to these allegations, the undisputed facts can be simply stated:

## A.    Exhaustion of Grievances

The plaintiff, Dawn Ball is a state inmate housed at the SCI Muncy. With respect to the matters set forth in this lawsuit, a review of Ball's fully exhausted grievances between March 31, 2009 and June 30, 2009 show that Ball appealed 18 grievances through each stage of the process. (Doc. 111 ¶¶ 2-41.) None of those grievances concerned the events alleged within the complaint. (Id.) Further, prison records confirm that Ball had filed a total of 27 grievances between May 26, 2009 and June 16, 2009. (Doc. 111, ¶ 21.)

This undisputed evidence is significant on several scores. First, it shows that Ball has not fully and properly exhausted her prison administrative grievances with respect to the matters set forth in this complaint. In addition, this undisputed evidence rebuts any claim by Ball that she was prevented or impeded from filing

grievances since she filed literally dozens of grievances in the Spring of 2009. Finally, this undisputed evidence clearly indicates that Ball was fully familiar with Department of Corrections grievance procedures in 2009, which required inmates to grieve dispute with prison officials, having filed numerous grievances in the past.

Specifically, pursuant to 37 Pa. C.S. § 93.9, the Department of Corrections maintains a grievance system, which is conducted in accordance with Administrative Directive DC-ADM 804, entitled "Inmate Grievance System." DC-ADM 804 establishes procedures for review of inmate grievances and consists of a three-step process. See Booth v. Churner, 206 F.3d 289, 293, n. 2 (3d Cir. 2000). This three-step process requires an inmate to file an initial grievance (Step One), an appeal to the Superintendent (Step Two), and a final appeal (Step Three) to the Secretary's Office of Inmate Grievances and Appeals ("SOIGA"). To file an initial grievance, an inmate must submit to the Facility Grievance Coordinator a completed grievance form. Id. The inmate must specifically state any claims he or she wishes to make concerning violations of Department directives, regulations, court orders, or other law and state the relief sought. The grievance must be submitted within fifteen working days after the event in question. If the Grievance is denied, the inmate may appeal within ten days to the Facility Manager. If the inmate is dissatisfied with the decision of the

Facility Manager, she may then appeal to SOIGA within fifteen days of the Facility Manager's decision.

In this case, with respect to the allegations leveled against these corrections defendants Ball has alleged acts occurring between March 22, 2009 and April 13, 2009, yet Ball filed her complaint only 9 days after the last alleged episode, on April 22, 2009. (Doc. 1.) As a matter both of law and fact, it would have been impossible for Ball to have fully grieved these episodes prior to proceeding to federal court given the time frame for grievance proceedings prescribed by prison regulations.

Nor can Ball allege at this time that prison officials unfairly refused her an opportunity to grieve these matters. Indeed, any such claim would be contradicted by Ball's complaint, which flatly stated that she had filed a grievance concerning these matters. (Doc. 1, p. 1, Sec. II A and B.) Moreover, the record affirmatively reveals that Ball filed a series of dozens of unrelated grievances during this period, thus demonstrating that she had access to the prison grievance process at the time of these events. (Doc. 111.)

**B.    Ball's Claims In Her Complaint Are Both Procedurally and Substantively Flawed**

Furthermore, as to Ball's complaints regarding confiscation of property and access to the courts, Ball's complaint is flawed in at least two basic respects. First,

Ball never identifies a meritorious claim that was lost by the plaintiff due to any alleged obstruction of her court access. Similarly, Ball protests the alleged confiscation of certain property by prison staff, but affirmatively alleges she was provided a post-deprivation remedy through the prison grievance process. (Doc. 1, p. 1, Sec. II A and B.)

Indeed, in its current form this case presents a singular set of circumstances. The *pro se* plaintiff, a state prisoner, has sued her jailers, alleging that they have violated her constitutional rights in a number of respects. The defendants have now moved for summary judgment on these claims, citing a profound procedural failure by the plaintiff, a failure to exhaust administrative remedies within the prison system before filing this complaint. Such administrative exhaustion is required by law before an inmate may proceed into federal court.

Having been cited by the defendants for this procedural shortcoming, the plaintiff has compounded this error by failing to respond to the summary judgment motion. Thus, a plaintiff who is alleged to have ignored one set of important procedural rules has now discounted a second set of cardinal procedural benchmarks. In this face of this cascading array of procedural failures, we recommend that this action be dismissed.

As we have noted, this *pro se* civil rights action was initially brought by the plaintiff, a county prisoner, through the filing of a complaint on April 22, 2009. (Doc. 1.) As a *pro se* litigant the plaintiff was advised by this court at the outset of this lawsuit of her responsibilities in this litigation. Thus, on April 24, 2009, the district court entered its Standing Practice Order in this case, an order which informed the plaintiff of her responsibility to reply to defense motions, and warned her in clear and precise terms of the consequences which would flow from a failure to comply with briefing schedules on motions, stating:

> If the party opposing the motion does not file his or her brief and any evidentiary material within the 15-day time frame, Local Rule 7.6 provides that he or she shall be deemed not to oppose the moving party's motion. The motion may therefore be granted if: (1) the court finds it meritorious; or (2) the opposing party fails to comply with Local Rule 7.6 despite being ordered to do so by the court.

(Doc. 8, p. 3.)

On August 20, 2012 the corrections defendants filed a motion for summary judgment in this case. (Doc. 109.) At the same time that the defendants filed this motion, Ball was indulging in a series of dilatory tactics, tactics which presented the court with a pattern of willful non-compliance with scheduling orders and other directives. For example, this motion was filed against the backdrop of repeated efforts by this plaintiff over the span of several months to avoid all of her litigation

responsibilities. Thus, on May 15, 2012, Ball sought to stay all of her multi-faceted federal court litigation, in an apparent effort to delay or avoid rulings in these cases on many ripe defense motions. (Doc. 85.) On May 15, 2012, we denied this request made by Ball, noting that there was something profoundly inconsistent in these pleadings, since Ball's motions began with factual averments which detailed a series of allegedly improper actions by prison officials, allegations which if true required immediate attention by the courts. (Doc. 86.) Yet, while Ball recited facts which cried out for action by the courts, she sought relief which would not be in her interests, or in the interests of justice: a complete cessation of this litigation. (<u>Id</u>.) Because we believed that we owed it to Ball, and to all of the many defendants she has sued, to promptly address the merits of her claims, on May 15, 2012, we denied Ball's first motions to generally stay all of Ball's litigation to some future date of her choosing. Instead, we instructed Ball in clear and precise terms as follows:

> In the meanwhile Ball is directed to continue to comply with the filing deadlines previously set by this court and IT IS ORDERED that any future requests for continuance or stay must be made individually by Ball in each of her cases along with factual averments specific to each particular case explaining why a stay or continuance is necessary.

(<u>Id</u>.)

Presented with this clear instruction from the court, Ball then chose to ignore this guidance and filed another global stay request in all of her cases. (Doc. 89.) Indeed, in this second stay motion Ball endeavored not only to ignore the court's prior order, but to try to ignore the court altogether by instructing the clerk's office to present these latest stay motions to another judge. (Id.) Furthermore, Ball's motion sought more than a stay of future litigation, she also demanded that all orders in all of her cases entered since April, 2012, be "revoked." (Id.) We denied this second stay motion as well, (Doc. 91.), but once again explained to Ball "that any requests for continuance or stay must be made individually by Ball in each of her cases along with factual averments specific to each particular case identifying the deadline she wishes to extend or stay, and explaining why a stay or continuance is necessary." (Id., p. 8.)

Moreover, the Department of Corrections has attested to the court that it is, in fact, providing Ball with access to her legal materials, allowing her to retain as many as 8 boxes of material in her cell at a time; requiring staff to work with her over two days in May, 2012, to organize her legal documentation; retaining all of Ball's voluminous litigation records; providing her with pens, paper and postage at no cost; and permitting Ball on a bi-weekly basis to rotate litigation files into her cell to meet her new and on-going litigation needs. (Doc. 103.) Thus, the record reflects that Ball

is being provided with all of the information and resources she needs to respond to defense motions and prosecute this case.

Despite our specific, explicit and repeated guidance to Ball, she persisted in filing an additional, inappropriate generic and global stay request on September 11, 2012. (Doc. 113.) In this motion Ball sought an additional thirty days from September 11, 2012, in which to respond to the motion for summary judgment filed by the corrections defendants. We did not immediately act upon this request, instead allowing 170 days to pass before dismissing this request as moot. Even though 170 days–five times the 30 day extension sought by Ball–have elapsed, Ball has never filed the motion response which she represented to the court that she would file within 30 days in her motion for a stay or extension of time.

Notably, Ball's failure to act in this case coincided with the entry of an order by the court dismissing other defendants from this action due to Ball's undisputed failure to exhaust her administrative remedies. Thus, it appears that Ball has declined to further address this issue or litigate this matter after she recognized through the court's prior rulings that her complaint was fundamentally flawed on exhaustion grounds.

In sum, the plaintiff has not responded to this summary judgment motion, and the time for responding has now passed. Therefore, in the absence of any timely

response by the plaintiff, we will deem the motion to be ripe for resolution. For the reasons set forth below, we recommend that the summary judgment motion be granted.

## II. <u>Discussion</u>

### A. <u>Under The Rules of This Court This Motion for Summary Judgment Should Be Deemed Unopposed and Granted</u>

At the outset, under the Local Rules of this court the plaintiff should be deemed to concur in this motion to dismiss, since the plaintiff has failed to timely oppose the motion, or otherwise litigate this case. This procedural default completely frustrates and impedes efforts to resolve this matter in a timely and fair fashion, and under the rules of this court warrants dismissal of the action, since Local Rule 7.6 of the Rules of this court imposes an affirmative duty on the plaintiff to respond to motions and provides that:

> Any party opposing any motion, other than a motion for summary judgment, shall file a brief in opposition within fourteen (14) days after service of the movant's brief, or, if a brief in support of the motion is not required under these rules, within seven (7) days after service of the motion. *Any party who fails to comply with this rule shall be deemed not to oppose such motion.* Nothing in this rule shall be construed to limit the authority of the court to grant any motion before expiration of the prescribed period for filing a brief in opposition. A brief in opposition to a motion for summary judgment and LR 56.1 responsive statement, together with any transcripts, affidavits or other relevant documentation, shall be filed within twenty-one (21) days after service of the movant's brief.

Local Rule 7.6 (emphasis added).

In this case the plaintiff has not complied with the local rules, or this court's orders, by filing a timely response to this motion. Therefore, these procedural defaults by the plaintiff compel the court to consider:

> [A] basic truth: we must remain mindful of the fact that "the Federal Rules are meant to be applied in such a way as to promote justice. *See* Fed.R.Civ.P. 1. Often that will mean that courts should strive to resolve cases on their merits whenever possible. However, justice also requires that the merits of a particular dispute be placed before the court in a timely fashion ...." McCurdy v. American Bd. of Plastic Surgery, 157 F.3d 191, 197 (3d Cir.1998).

Lease v. Fishel, 712 F. Supp. 2d 359, 371 (M.D.Pa. 2010).

With this basic truth in mind, we acknowledge a fundamental guiding tenet of our legal system. A failure on our part to enforce compliance with the rules, and impose the sanctions mandated by those rules when the rules are repeatedly breached, "would actually violate the dual mandate which guides this court and motivates our system of justice: 'that courts should strive to resolve cases on their merits whenever possible [but that] justice also requires that the merits of a particular dispute be placed before the court in a timely fashion'." Id. Therefore, we are obliged to ensure that one party's refusal to comply with the rules does not lead to an unjustified prejudice to those parties who follow the rules.

These basic tenets of fairness apply here. In this case, the plaintiff has failed to comply with Local Rule 7.6 by filing a timely response to the motion for summary judgment. These failures now compel us to apply the sanction called for under Rule 7.6 and deem the plaintiff to not oppose this motion.

## B. Dismissal of this Case Is Also Warranted Under Rule 41

Beyond the requirements imposed by the Local Rules of this court, Rule 41(b) of the Federal Rules of Civil Procedure authorizes a court to dismiss a civil action for failure to prosecute, stating that: "If the plaintiff fails to prosecute or to comply with these rules or a court order, a defendant may move to dismiss the action or any claim against it." Fed. R. Civ. P. 41(b). Decisions regarding dismissal of actions for failure to prosecute rest in the sound discretion of the court, and will not be disturbed absent an abuse of that discretion. Emerson v. Thiel College, 296 F.3d 184, 190 (3d Cir. 2002)(citations omitted). That discretion, however, while broad is governed by certain factors, commonly referred to as Poulis factors. As the United States Court of Appeals for the Third Circuit has noted:

> To determine whether the District Court abused its discretion [in dismissing a case for failure to prosecute], we evaluate its balancing of the following factors: (1) the extent of the party's personal responsibility; (2) the prejudice to the adversary caused by the failure to meet scheduling orders and respond to discovery; (3) a history of dilatoriness; (4) whether the conduct of the party or the attorney was willful or in bad faith; (5) the effectiveness of sanctions other than

> dismissal, which entails an analysis of alternative sanctions; and (6) the meritoriousness of the claim or defense. Poulis v. State Farm Fire and Cas. Co., 747 F.2d 863, 868 (3d Cir.1984).

Emerson, 296 F.3d at 190.

In exercising this discretion "there is no 'magic formula' that we apply to determine whether a district court has abused its discretion in dismissing for failure to prosecute." Lopez v. Cousins, 435 F. App'x 113, 116 (3d Cir. 2011) (quoting Briscoe v. Klem, 538 F.3d 252 (3d Cir. 2008))  Therefore, "[i]n balancing the Poulis factors, [courts] do not [employ] a . . . 'mechanical calculation' to determine whether a district court abused its discretion in dismissing a plaintiff's case. Mindek v. Rigatti, 964 F.2d 1369, 1373 (3d Cir.1992)." Briscoe v. Klaus,  538 F.3d at 263. Consistent with this view, it is well-settled that " 'no single Poulis factor is dispositive,' Ware, 322 F.3d at 222, [and it is] clear that 'not all of the Poulis factors need be satisfied in order to dismiss a complaint.' Mindek, 964 F.2d at 1373." Briscoe v. Klaus,  538 F.3d at 263. Moreover, recognizing the broad discretion conferred upon the district court in making judgments weighing these six factors, the court of appeals has frequently sustained such dismissal orders where there has been a pattern of dilatory conduct by a *pro se* litigant who is not amenable to any lesser sanction. See, e.g., Emerson v. Thiel College, supra; Tillio v. Mendelsohn, 256 F. App'x 509

19

(3d Cir. 2007); <u>Reshard v. Lankenau Hospital</u>, 256 F. App'x 506  (3d Cir. 2007); <u>Azubuko v. Bell National Organization</u>, 243 F. App'x 728 (3d Cir. 2007).

In this case, a dispassionate assessment of the <u>Poulis</u> factors weighs heavily in favor of dismissing this action.  At the outset, a consideration of the first <u>Poulis</u> factor, the extent of the party's personal responsibility, shows that the delays in this case are entirely attributable to the plaintiff, who has failed to abide by court orders, and has otherwise neglected to litigate this case, or respond to defense motions.

Similarly, the second <u>Poulis</u> factor– the prejudice to the adversary caused by the failure to abide by court orders–also calls for dismissal of this action.  Indeed, this factor–the prejudice suffered by the party seeking sanctions–is entitled to great weight and careful consideration.  As the United States Court of Appeals for the Third Circuit has observed:

> "Evidence of prejudice to an adversary would bear substantial weight in support of a dismissal or default judgment." <u>Adams v. Trustees of N.J. Brewery Employees' Pension Trust Fund</u>, 29 F.3d 863, 873-74 (3d Cir.1994) (internal quotation marks and citation omitted).  Generally, prejudice includes "the irretrievable loss of evidence, the inevitable dimming of witnesses' memories, or the excessive and possibly irremediable burdens or costs imposed on the opposing party." <u>Id</u>. at 874 (internal quotation marks and citations omitted). . . . However, prejudice is not limited to "irremediable" or "irreparable" harm. <u>Id.</u>; <u>see also Ware v. Rodale Press, Inc.</u>, 322 F.3d 218, 222 (3d Cir.2003); <u>Curtis T. Bedwell & Sons, Inc. v. Int'l Fidelity Ins. Co.</u>, 843 F.2d 683, 693-94 (3d Cir.1988). It also includes "the burden imposed by impeding a party's ability to prepare effectively a full and complete trial strategy." <u>Ware</u>, 322 F.3d at 222.

Briscoe v. Klaus, 538 F.3d at 259-60.

In this case the plaintiff's failure to litigate this claim or comply with court orders now wholly frustrates and delays the resolution of this action. In such instances, the defendants are plainly prejudiced by the plaintiff's continuing inaction and dismissal of the case clearly rests in the discretion of the trial judge. Tillio v. Mendelsohn, 256 F. App'x 509 (3d Cir. 2007) (failure to timely serve pleadings compels dismissal); Reshard v. Lankenau Hospital, 256 F. App'x 506 (3d Cir. 2007) (failure to comply with discovery compels dismissal); Azubuko v. Bell National Organization, 243 F. App'x 728 (3d Cir. 2007) (failure to file amended complaint prejudices defense and compels dismissal).

When one considers the third Poulis factor-the history of dilatoriness on the plaintiff's part–it becomes clear that dismissal of this action is now appropriate. In this regard, it is clear that "'[e]xtensive or repeated delay or delinquency constitutes a history of dilatoriness, such as consistent non-response . . . , or consistent tardiness in complying with court orders.' Adams, 29 F.3d at 874." Briscoe v. Klaus, 538 F.3d at 260-61 (some citations omitted). Here, the plaintiff has allegedly failed to exhaust her administrative remedies before filing this lawsuit and now has failed to respond to a defense motion which highlights this earlier procedural failure. The plaintiff has also failed to timely file pleadings, and has not complied with orders of the court.

Thus, the plaintiff's conduct displays "[e]xtensive or repeated delay or delinquency [and conduct which] constitutes a history of dilatoriness, such as consistent non-response . . . , or consistent tardiness in complying with court orders." <u>Adams,</u> 29 F.3d at 874.

The fourth <u>Poulis</u> factor–whether the conduct of the party or the attorney was willful or in bad faith–also cuts against the plaintiff in this case. In this setting we must assess whether this conduct reflects mere inadvertence or willful conduct, in that it involved "strategic," "intentional or self-serving behavior," and not mere negligence. <u>Adams v. Trs. of N.J. Brewery Emps.' Pension Trust Fund</u>, 29 F.3d 863, 875 (3d Cir.1994). At this juncture, when the plaintiff has failed to comply with instructions of the court directing the plaintiff to take specific actions in this case, and has violated the Local Rules, the court is compelled to conclude that the plaintiff's actions are not accidental or inadvertent but instead reflect an intentional disregard for this case and the court's instructions.

While <u>Poulis</u> also enjoins us to consider a fifth factor, the effectiveness of sanctions other than dismissal, cases construing <u>Poulis</u> agree that in a situation such as this case, where we are confronted by a *pro se* litigant who will not comply with the rules or court orders, lesser sanctions may not be an effective alternative. <u>See, e.g.,</u> <u>Briscoe v. Klaus</u>, 538 F.3d 252, 262-63 (3d Cir. 2008); <u>Emerson</u>, 296 F.3d at

191. This case presents such a situation where the plaintiff's status as a *pro se* litigant severely limits the ability of the court to utilize other lesser sanctions to ensure that this litigation progresses in an orderly fashion. In any event, by entering our prior orders, and counseling the plaintiff on her obligations in this case, we have endeavored to use lesser sanctions, but to no avail. The plaintiff still declines to obey court orders, and otherwise ignores her responsibilities as a litigant. Since lesser sanctions have been tried, and have failed, only the sanction of dismissal remains available to the court.

Finally, under Poulis we are cautioned to consider one other factor, the meritoriousness of the plaintiff's claims. In our view, however, consideration of this factor cannot save this particular plaintiff's claims, since the plaintiff is now wholly non-compliant with her obligations as a litigant. The plaintiff cannot refuse to address the merits of her claims, and then assert the untested merits of these claims as grounds for denying a motion to sanction her. Furthermore, it is well-settled that " 'no single Poulis factor is dispositive,' Ware, 322 F.3d at 222, [and it is] clear that 'not all of the Poulis factors need be satisfied in order to dismiss a complaint.' Mindek, 964 F.2d at 1373." Briscoe v. Klaus, 538 F.3d at 263. Therefore, the untested merits of the non-compliant plaintiff's claims, standing alone, cannot prevent imposition of sanctions.

In any event, as discussed below, the plaintiff's claims clearly fail on their merits, yet another factor which favors dismissal of this action. The legal flaws inherent in these claims are discussed separately below.

## C.  The Plaintiff's Claims Fail on Their Merits

### 1.  Rule 56–The Legal Standard

The defendants have moved for judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Through summary adjudication a court is empowered to dispose of those claims that do not present a "genuine dispute as to any material fact," Fed. R. Civ. P. 56(a), and for which a trial would be "an empty and unnecessary formality." Univac Dental Co. v. Dentsply Int'l, Inc., No. 07-0493, 2010 U.S. Dist. LEXIS 31615, at *4 (M.D. Pa. Mar. 31, 2010). The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. Id. at 248-49.

24

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004). Once the moving party has shown that there is an absence of evidence to support the nonmoving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322. Summary judgment is also appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence. Anderson, 477 U.S. at 249. There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts. Id. at 252; see also, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In making this determination, the court must "consider all evidence in the light most favorable to the party opposing the motion." A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

Moreover, a party who seeks to resist a summary judgment motion by citing to disputed material issues of fact must show by competent evidence that such factual disputes exist. Moreover, a party who seeks to resist a summary judgment motion by citing to disputed material issues of fact must show by competent evidence that such factual disputes exist. Further, "only evidence which is admissible at trial may be considered in ruling on a motion for summary judgment." Countryside Oil Co., Inc. v. Travelers Ins. Co., 928 F.Supp. 474, 482 (D.N.J.1995). This rule applies with particular force to parties who attempt to rely upon hearsay statements to establish material issues of fact which would preclude summary judgment. With respect to such claims, it is well-settled that: "In this circuit, hearsay statements can be considered on a motion for summary judgment [only] if they are capable of admission at trial." Shelton v. University of Medicine & Dentistry of N.J., 223 F.3d 220, 223, n.2 (3d Cir. 2000), citing Stelwagon Mfg. v. Tarmac Roofing Sys., Inc., 63 F.3d 1267, 1275, n.17 (3d Cir. 1995). In this regard it has been aptly observed that:

> It is clear that when considering a motion for summary judgement, a court may only consider evidence which is admissible at trial, and that a party can not rely on hearsay evidence when opposing a motion for summary judgment. See Buttice v. G.D. Searle & Co., 938 F.Supp. 561 (E.D.Mo.1996). Additionally, a party must respond to a hearsay objection by demonstrating that the material would be admissible at trial under an exception to hearsay rule, or that the material is not hearsay. See Burgess v. Allstate Ins. Co., 334 F.Supp.2d 1351 (N.D.Ga.2003). The mere possibility that a hearsay statement will be admissible at trial, does not permit its consideration at the summary judgment stage. Henry

v. Colonial Baking Co. of Dothan, 952 F.Supp. 744 (M.D.Ala.1996).

Bouriez v. Carnegie Mellon Univ., No. 02-2104, 2005 WL 2106582,* 9 (W.D.Pa. Aug. 26, 2005). Thus, a party may not rely upon inadmissible hearsay assertions to avoid summary judgment. Therefore, where a party simply presents inadmissible hearsay declarations in an attempt to establish a disputed material issue of fact, courts have typically rebuffed these efforts and held instead that summary judgment is appropriate. See, e.g., Synthes v. Globus Medical, Inc., No. 04-1235, 2007 WL 2043184 (E.D.Pa. July 12, 2007); Bouriez v. Carnegie Mellon Univ., No. 02-2104, 2005 WL 2106582,* 9 (W.D.Pa. Aug. 26, 2005); Carpet Group Int'l v. Oriental Rug Importers Assoc., Inc., 256 F.Supp.2d 249 (D.N.J. 2003).

Similarly, it is well-settled that: "[o]ne cannot create an issue of fact merely by . . . denying averments . . . without producing any supporting evidence of the denials." Thimons v. PNC Bank, NA, 254 F.App'x 896, 899 (3d Cir. 2007)(citation omitted). Thus, "[w]hen a motion for summary judgment is made and supported . . ., an adverse party may not rest upon mere allegations or denial." Fireman's Ins. Co. Of Newark NJ v. DuFresne, 676 F.2d 965, 968 (3d Cir. 1982), see Sunshine Books, Ltd. v. Temple University, 697 F.2d 90, 96 (3d Cir. 1982)."[A] mere denial is insufficient to raise a disputed issue of fact, and an unsubstantiated doubt as to the veracity of the opposing affidavit is also not sufficient." Lockhart v. Hoenstine, 411 F.2d 455, 458

(3d Cir. 1969).  Furthermore, "a party resisting a [Rule 56] motion cannot expect to rely merely upon bare assertions, conclusory allegations or suspicions."  Gans v. Mundy, 762 F.2d 338, 341 (3d Cir. 1985)(citing Ness v. Marshall, 660 F.2d 517, 519 (3d Cir. 1981)).

Finally, a party who seeks to resist a summary judgment motion must also comply with Local Rule 56.1, which specifically directs a party opposing a motion for summary judgment to submit a "statement of the material facts, responding to the numbered paragraphs set forth in the statement required [to be filed by the movant], as to which it is contended that there exists a genuine issue to be tried"; if the nonmovant fails to do so, "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted." L.R. 56.1.  Under the Local Rules, the failure to follow these instructions  and appropriately challenge the material facts tendered by the defendant means that those facts must be deemed, since:

> A failure to file a counter-statement equates to an admission of all the facts set forth in the movant's statement.  This Local Rule serves several purposes.  First, it is designed to aid the court in its determination of whether any genuine issue of material fact is in dispute.  Second, it affixes the burden imposed by Federal Rule of Civil Procedure 56(e), as recognized in Celotex Corp. v. Catrett, on the nonmoving party 'to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, *designated specific facts showing that there is a genuine issue for trial*.' 477 U.S. 317, 324 (1986) (internal quotations omitted) (emphasis added).

28

Doe v. Winter, No. 04-CV-2170, 2007 U.S. Dist. LEXIS 25517, *2 n.2 (M.D. Pa. Apr. 5, 2007) (parallel citations omitted; court's emphasis).

A party cannot evade these litigation responsibilities in this regard simply by citing the fact that she is a *pro se* litigant. These rules apply with equal force to all parties. See Sanders v. Beard, No. 09-CV-1384, 2010 U.S. Dist. LEXIS, *15 (M.D. Pa. July 20, 2010) (*pro se* parties "are not excused from complying with court orders and the local rules of court"); Thomas v. Norris, No. 02-CV-01854, 2006 U.S. Dist. LEXIS 64347, *11 (M.D. Pa. Sept. 8, 2006) (*pro se* parties must follow the Federal Rules of Civil Procedure). Therefore, Ball's failure to comply with Local Rule 56.1 compels us to treat the failure to file a counter-statement as an admission of all the facts set forth in the movant's statement.

### 2. The Prison Litigation Reform Act's Exhaustion Requirement

The defendants first urge the court to grant summary judgment on the plaintiff's claims because Ball failed to fully exhaust the administrative remedies available to her under Department of Corrections procedures. In this case Ball's failure to timely pursue these administrative remedies may have substantive significance for the plaintiff since the Prison Litigation Reform Act provides that "[n]o action shall be brought with respect to prison conditions under . . . [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other

correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Section 1997e's exhaustion requirement applies to a wide-range of inmate complaints, including damages complaints like those made by Ball grounded in alleged violations of the Eighth Amendment. See Spruill v. Gillis, 372 F.3d 218 (3d Cir. 2004); Booth v. Churner, 206 F.3d 289 (3d Cir. 2000). While this exhaustion requirement is not a jurisdictional bar to litigation, this requirement is strictly enforced by the courts. This rigorous enforcement is mandated by a fundamental recognition that § 1997e's exhaustion requirement promotes important public policies. As the United States Court of Appeals for the Third Circuit has noted:

> Courts have recognized myriad policy considerations in favor of exhaustion requirements. They include (1) avoiding premature interruption of the administrative process and giving the agency a chance to discover and correct its own errors; (2) conserving scarce judicial resources, since the complaining party may be successful in vindicating his rights in the administrative process and the courts may never have to intervene; and (3) improving the efficacy of the administrative process. Each of these policies, which Congress seems to have had in mind in enacting the PLRA, is advanced by the across-the-board, mandatory exhaustion requirement in § 1997e(a). ... [A] a comprehensive exhaustion requirement better serves the policy of granting an agency the "opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court." Moreover, "even if the complaining prisoner seeks only money damages, the prisoner may be successful in having the [prison] halt the infringing practice" or fashion some other remedy, such as returning personal property, reforming personal property policies, firing an abusive prison guard, or creating a better screening process for hiring such guards. And when a prisoner obtains some measure of affirmative

relief, he may elect not to pursue his claim for damages. In either case, local actors are given the chance to address local problems, and at the very least, the time frame for the prisoner's damages is frozen or the isolated acts of abuse are prevented from recurring. An across-the-board exhaustion requirement also promotes judicial efficiency. . . . Moreover, even if only a small percentage of cases settle, the federal courts are saved the time normally spent hearing such actions and multiple appeals thereto. . . . In cases in which inmate-plaintiffs exhaust their remedies in the administrative process and continue to pursue their claims in federal court, there is still much to be gained. The administrative process can serve to create a record for subsequent proceedings, it can be used to help focus and clarify poorly pled or confusing claims, and it forces the prison to justify or explain its internal procedures. All of these functions help courts navigate the sea of prisoner litigation in a manner that affords a fair hearing to all claims.

Nyhuis v. Reno, 204 F.3d 65, 75-76 (3d Cir. 2000)(citations omitted).

Because of the important policies fostered by this exhaustion requirement, it has been held that there is no futility exception to § 1997e's exhaustion requirement. Id. Instead, courts have typically required across-the-board administrative exhaustion by inmate plaintiffs who seek to pursue claims in federal court.

Moreover, courts have also imposed a procedural default component on this exhaustion requirement, holding that inmates must fully satisfy the administrative requirements of the inmate grievance process before proceeding into federal court. Spruill v. Gillis, 372 F.3d 218 (3d Cir. 2004). Applying this procedural default standard to § 1997e's exhaustion requirement, courts have concluded that inmates who fail to fully, or timely, complete the prison grievance process are barred from subsequently litigating claims in federal court. See, e.g., Booth v. Churner, 206 F.3d

289 (3d Cir. 2000); <u>Bolla v. Strickland</u>, 304 F. App'x 22 (3d Cir. 2008); <u>Jetter v.</u>

<u>Beard</u>, 183 F. App'x 178 (3d Cir. 2006).

Furthermore, applying this procedural default component to the exhaustion

requirement, <u>Spruill v. Gillis</u>, 372 F.3d 218 (3d Cir. 2004), it has been held that:

> As for the failure to the identify named defendants on the grievance
> form, . . . to the extent the identity of a defendant was "a fact relevant to
> the claim," Pennsylvania's prison grievance policy mandated that the
> identification be included in the inmate's statement of facts on the
> grievance form. And, . . . in the absence of any justifiable excuse, a
> Pennsylvania inmate's failure to properly identify a defendant
> constituted a failure to properly exhaust his administrative remedies
> under the PLRA.

<u>Williams v. Pennsylvania Dep't. of Corrections</u>, 146 F. App'x 554, 557(3d Cir.

2005).[4] Thus, "it is clear, regardless of the purpose of the requirement, that <u>Spruill</u>

requires the prisoner-grievant-plaintiff to name in the grievance those he eventually

sues, upon pain of procedural default. <u>Hemingway v. Ellers</u>, No. 07-1764, 2008 WL

3540526, *11 (M.D.Pa. Aug.12, 2008).

This broad rule favoring full exhaustion admits of one, narrowly defined

exception. If the actions of prison officials directly caused the inmate's procedural

default on a grievance, the inmate will not be held to strict compliance with this

---

[4]While the <u>Williams</u> decision is not precedential, it is highly persuasive as a
"paradigm of the legal analysis [this Court] should . . . follow." <u>Drinker v.</u>
<u>Colonial Sch. Dist.</u>, 78 F.3d 859, 864 n.12 (3d Cir. 1996). We find the reasoning
in <u>Williams</u> compelling, and recommend that this reasoning be extended to the
instant case.

exhaustion requirement.  See Camp  v. Brennan, 219 F.3d 279 (3d Cir. 2000). However, case law recognizes a clear "reluctance to invoke equitable reasons to excuse [an inmate's] failure to exhaust as the statute requires." Davis v. Warman, 49 F. App'x 365, 368 (3d Cir. 2002).  Thus, an inmate's failure to exhaust will only be excused "under certain limited circumstances", Harris v. Armstrong, 149 F. App'x 58, 59 (3d Cir. 2005), and an inmate can defeat a claim of  failure to exhaust only by showing "he was misled or that there was some extraordinary reason he was prevented from complying with the statutory mandate." Davis v. Warman, supra,  49 F. App'x at 368. See also Brown v. Croak, 312 F.3d 109, 110 (3d Cir. 2002) (assuming that prisoner with failure to protect claim is entitled to rely on instruction by prison officials to wait for outcome of internal security investigation before filing grievance); Camp v. Brennan, 219 F.3d 279, 281 (3d Cir. 2000) (exhaustion requirement met where Office of Professional Responsibility fully examined merits of excessive force claim and it was uncontradicted that correctional officers impeded filing of grievance).

Furthermore, it is entirely clear that a claim that a prisoner was under a grievance restriction pursuant to DC-ADM 804, does not, by itself, excuse the failure to grieve this matter prior to filing suit in federal court, since those Corrections policies plainly allow inmates to file a limited number of grievances.  Indeed, the United States Court of Appeals for the Third Circuit has rejected this precise

argument in <u>Cummings v. Crumb</u>, 347 F. App'x 725, 727 (3d Cir. 2009), stating in that case that:

> [The inmate] also argued that he was denied the grievance process because he was on grievance restriction. According to the Pennsylvania Department of Corrections Grievance Policy DC-ADM 804 Part IV.L, an inmate on grievance restriction is restricted to filing no more than one grievance every 15 days. *Thus, being on grievance restriction would not have prevented [an inmate] from exhausting his remedies.*

<u>Cummings v. Crumb</u>, 347 F. App'x 725, 727 (3d Cir. 2009)(emphasis added).

In the absence of competent proof that an inmate was misled by corrections officials, or some other extraordinary circumstances, inmate requests to excuse a failure to exhaust are frequently rebuffed by the courts. Thus, an inmate cannot excuse a failure to timely comply with these grievance procedures by simply claiming that his efforts constituted "substantial compliance" with this statutory exhaustion requirement. <u>Harris v. Armstrong</u>, 149 F. App'x 58, 59 (3d Cir. 2005). Nor can an inmate avoid this exhaustion requirement by merely alleging that the Department of Corrections policies were not clearly explained to him. <u>Davis v. Warman,</u> 49 F. App'x 365, 368 (3d Cir. 2002). Furthermore, an inmate's confusion regarding these grievance procedures does not, standing alone, excuse a failure to exhaust. <u>Casey v. Smith</u>, 71 F. App'x 916 (3d Cir. 2003). Moreover, an inmate cannot cite to alleged staff impediments to grieving a matter as grounds for excusing a failure to exhaust, if it also appears that the prisoner did not pursue a proper grievance once those

impediments were removed. <u>Oliver v. Moore</u>, 145 F. App'x 731 (3d Cir. 2005)(failure to exhaust not excused if, after staff allegedly ceased efforts to impede grievance, prisoner failed to follow through on grievance).

Thus, in this setting, the Prison Litigation Reform Act requires that an inmate fully exhaust her administrative remedies before proceeding into federal court, an administrative exhaustion requirement which entails full compliance with state grievance procedures and timelines, as well as the basic requisite that the inmate identify those against whom she has a grievance during the administrative process before she may name these individuals as defendants in a federal lawsuit.

### 3. <u>Ball Has Failed to Properly Exhaust Her Administrative Remedies</u>

Judged against these guideposts, we find that the defendants are entitled to summary judgment in their favor on the grounds that Ball has failed to satisfy the PLRA's administrative exhaustion requirement. In this case, it is entirely undisputed that Ball has never exhausted her administrative remedies. Indeed, it would have been entirely impossible for Ball to have completed the exhaustion process mandated by the PLRA with respect to these allegations. With regard to the allegations Ball has made against these defendants, Ball has alleged acts occurring between March 22, 2009 and April13, 2009, yet Ball filed her complaint only 9 days after the last alleged episode, on April 22, 2009. (Doc. 1.) As a matter both of law and fact, it would have

been impossible for Ball to have fully grieved these episodes in 9 days prior to proceeding to federal court, given the time frame for grievance proceedings prescribed by prison regulations.

Nor can Ball allege at this time that prison officials unfairly refused her an opportunity to grieve these matters. Indeed, any such claim would be contradicted by Ball's complaint, which flatly stated that she had filed a grievance concerning these matters. (Doc. 1, p. 1, Sec. II A and B.) Moreover, the record affirmatively reveals that Ball filed a series of unrelated medical grievances during this period, thus demonstrating that she had access to the prison grievance process at the time of these events. (Doc. 111.) Thus, we find that Ball has failed to carry her burden of proving "that there was some extraordinary reason [s]he was prevented from complying with the statutory mandate." Davis v. Warman, supra, 49 F. App'x at 368. On these facts, which are entirely undisputed, it is clear that Ball had ample opportunity to comply with the requirements of the PLRA by fully grieving these matters. Her failure to do so, therefore, is both unexcused, and inexcusable, and compels dismissal of this case.

### 4.    Ball's Property Confiscation and Access to Courts Claims Fail

In addition, in this litigation Ball has attempted to raise Fourth Amendment, due process and access-to-courts claims arising out the search of her cell and confiscation of her property. These claims, however, are unavailing. At the outset,

to the extent that the plaintiff is attempting to advance a Fourth Amendment claim in this prison setting, it is clear that this claim fails as a matter of law. While the Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV, in order to give force to this guarantee, government officials are limited to conducting searches that are reasonable. Delaware v. Prouse, 440 U.S. 648, 653-54 (1979); Florence v. Bd. of Chosen Freeholders of Burlington, 621 F.3d 296, 301 (3d Cir. 2010). As the Third Circuit has explained:

> Reasonableness under the Fourth Amendment is a flexible standard, Bodine v. Warwick, 72 F.3d 393, 398 (3d Cir. 1995), "not capable of precise definition or mechanical application, Bell [v. Wolfish, 441 U.S. 520, 559 (1979)]. "In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails." Id.

Florence, 621 F.3d at 301.

In Hudson v. Palmer, 468 U.S. 517, 529,(1984), and Block v. Rutherford, 468 U.S. 576 (1984) the Supreme Court directly addressed this issue in a custodial setting and unequivocally foreclosed plaintiff's claims relating to the searches of her cell. In Block and Hudson the Supreme Court flatly held that the search of a cell by prison officials does not violate the Fourth Amendment. More recently, the United States Court of Appeals for the Third Circuit has explained:

> The defendants correctly assert that prisoners do not have a Fourth Amendment right to privacy in their cells. Hudson v. Palmer, 468 U.S.

517, 529, 82 L. Ed. 2d 393, 104 S. Ct. 3194 (1984). The Supreme Court has concluded that the Fourth Amendment right to privacy, to be free from unreasonable searches, is fundamentally inconsistent with incarceration. Id. at 527. Mindful that internal security is a chief concern in prisons, the court recognized that it would be impossible to prevent the introduction of weapons, drugs and other contraband into the premises if prisoners maintained a right of privacy in their cells. Id. Therefore, "the Fourth Amendment has no applicability to a prison cell."

Doe v. Delie, 257 F.3d 309, 316 (3d Cir. 2001).

On the basis of the foregoing, it is beyond argument that the plaintiff did not enjoy a privacy right in her prison cell. For these reasons, plaintiff's Fourth Amendment constitutional claims regarding the search of this cell are without any legal merit.

Moreover, inmate due process claims arising out of the confiscation of property are judged against settled legal standards, standards which recognize that:

Like other constitutional rights, the Due Process rights of prisoners may be accommodated to a prison's legitimate security needs. See Bell v. Wolfish, 441 U.S. 520, 558-60, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). [Therefore] "[A]n unauthorized intentional deprivation of property" by prison officials does not violate the Due Process Clause "if a meaningful postdeprivation remedy for the loss is available." Hudson v. Palmer, 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)(citing Parratt v. Taylor, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981)). Pre-deprivation notice is not constitutionally required.

Monroe v. Beard, 536 F.3d 198, 210 (3d Cir. 2008).

Thus, there are two crucial component to any inmate due process claim in this setting: (1) the confiscation of property; *and* (2) an allegation that property was taken and the prisoner was afforded no post-deprivation administrative remedy. It follows, then,

that where a prison "provides an adequate post-deprivation remedy, see e.g., Tillman v. Lebanon County Corr. Fac., 121 F.3d 410, 422 (3d Cir.2000), . . . the existence of this post-deprivation remedy forecloses any due process claim, Austin v. Lehman, 893 F.Supp. 448, 454 (E.D.Pa.1995), even if an inmate is dissatisfied with the result of the process. Iseley v. Horn, 1996 WL 510090, at * 6 (E.D.Pa.1996)." Rambert v. Beard, 4:CV-09-0634, 2012 WL 760619 (M.D. Pa. Mar. 7, 2012). Here, Ball has alleged a confiscation of her property, but has not alleged that she was denied post-deprivation remedies, remedies which Ball acknowledges exist within the prison system, and remedies which she has actively pursued in the past. Accordingly, this complaint fails to allege facts which would give rise to a due process claim in this particular institutional setting.

Moreover, Ball's access to courts claim also fails on its merits. Since 1977, the United States Supreme Court has recognized that inmates have a constitutional right of access to the courts. Bounds v. Smith, 430 U.S. 817 (1977). As the Supreme Court initially observed, this right of access to the courts is satisfied when corrections officials facilitate "meaningful" access for those incarcerated, either through legal materials or the assistance of those trained in the law. Id. at 827 ("[T]he fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law.")

Two decades later, in 1996, the Supreme Court provided further definition and guidance regarding the scope and nature of this right of access to the courts in <u>Lewis v. Carey</u>, 518 U.S. 343 (1996). In <u>Lewis</u>, the court eschewed efforts to define this right in abstract, or theoretical terms, but rather cautioned courts to focus on concrete outcomes when assessing such claims. As the court observed:

> Because <u>Bounds</u> did not create an abstract, freestanding right to a law library or legal assistance, an inmate cannot establish relevant actual injury simply by establishing that his prison's . . . legal assistance program is subpar in some theoretical sense. . . . Insofar as the right vindicated by <u>Bounds</u> is concerned, "meaningful access to the courts is the touchstone," <u>id</u>., at 823, 97 S.Ct., at 1495 (internal quotation marks omitted), and the inmate therefore must go one step further and demonstrate that the alleged shortcomings in the . . . legal assistance program hindered his efforts to pursue a legal claim. . . . . Although <u>Bounds</u> itself made no mention of an actual-injury requirement, it can hardly be thought to have eliminated that constitutional prerequisite. And actual injury is apparent on the face of almost all the opinions in the 35-year line of access-to-courts cases on which <u>Bounds</u> relied, <u>see</u> <u>id.</u>, at 821-825, 97 S.Ct., at 1494-1497. Moreover, the assumption of an actual-injury requirement seems to us implicit in the opinion's statement that "we encourage local experimentation" in various methods of assuring access to the courts. <u>Id</u>., at 832, 97 S.Ct., at 1500.

<u>Lewis v. Casey</u>, 518 U.S. 343, 351-52 (1996).

Thus, following <u>Lewis</u>, courts have consistently recognized several guiding principles which animate access-to-court claims by prisoners. First, such claims require some proof of an actual, concrete injury, in the form of direct prejudice to the plaintiff in the pursuit of some legal claim. <u>See, e.g.</u>, <u>Oliver v. Fauver</u>, 118 F.3d 175 (3d Cir. 1997); <u>Demeter v. Buskirk</u>, No. 03-1005, 2003 WL 22139780 (E.D. Pa. Aug.

27, 2003); <u>Castro v. Chesney</u>, No. 97-4983, 1998 WL 150961 (E.D. Pa. March 31, 1998). A necessary corollary to this principle is that, in order to prevail on an access to the courts claim, a "plaintiff must identify a 'nonfrivolous,' 'arguable' underlying claim." <u>Christopher v. Harbury</u>, 536 U.S. 403, 415 (2002). Thus:

> Where prisoners assert that defendants' actions have inhibited their opportunity to present a past legal claim, they must show (1) that they suffered an "actual injury"-that they lost a chance to pursue a "nonfrivolous" or "arguable" underlying claim; and (2) that they have no other "remedy that may be awarded as recompense" for the lost claim other than in the present denial of access suit. <u>See</u> <u>Christopher v. Harbury</u>, 536 U.S. 403, 415, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002). To that end, prisoners must satisfy certain pleading requirements: The complaint must describe the underlying arguable claim well enough to show that it is "more than mere hope," and it must describe the "lost remedy." <u>See id.</u> at 416-17, 122 S.Ct. 2179.

<u>Monroe v. Beard</u>, 536 F.3d 198, 205-06 (3d Cir. 2008)

These legal tenets control here, and are fatal to this particular access to the courts claim. To make such a claim Ball "must describe the underlying arguable [legal] claim well enough to show that it is 'more than mere hope,' and it must describe the 'lost remedy.' " <u>Monroe v. Beard</u>, 536 F.3d 198, 206 (3d Cir. 2008). Here, Ball's pleadings do not sufficiently describe this state claim in a fashion which would permit any informed judgment regarding whether her underlying legal claims were anything more than a "mere hope." <u>Monroe v. Beard</u>, 536 F.3d 198, 206 (3d Cir. 2008). In fact, Ball does not describe, discuss, or identify any allegedly lost state claims at all in her complaint. Therefore, this claim fails.

## 5. The Defendants Are Entitled to Qualified Immunity

Finally, we find that even if Ball had stated a colorable claim for any actions relating to her property seizure and access to courts, the defendants would nevertheless be entitled to qualified immunity from these claims for damages. In order to establish a civil rights claim Ball must show the deprivation of a right secured by the United States Constitution or the laws of the United States. Satisfying these elements alone, however, does not guarantee that Ball is entitled to recover damages from these public officials. Government officials performing "discretionary functions," are insulated from suit if their conduct did not violate a "clearly established statutory or constitutional right[] of which a reasonable person would have known." Wilson v. Layne, 526 U.S. 603, 609 (1999); see also Pearson v. Callahan, 555 U.S. 223 (2009). This doctrine, known as qualified immunity, provides officials performing discretionary functions not only defense to liability, but also "immunity from suit." Crouse v. S. Lebanon Twp., 668 F. Supp. 2d 664, 671 (M.D. Pa. 2009) (Conner, J.) (citations omitted). Qualified immunity:

> balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."

Pearson, 555 U.S. at 231.

Determinations regarding qualified immunity, and its application in a given case, require a court to undertake two distinct inquiries. First, the court must evaluate whether the defendant violated a constitutional right. Saucier v. Katz, 533 U.S. 194, 201-02 (2001), abrogated in part by Pearson,555 U.S. 223; Curley v. Klem, 499 F.3d 199, 206 (3d Cir. 2007); Williams v. Bitner, 455 F.3d 186, 190 (3d Cir. 2006). If the defendant did not actually commit a constitutional violation, then the court must find in the defendant's favor. Saucier, 533 U.S. at 201. If the defendant is found to have committed a constitutional violation, the court must undertake a second, related inquiry to assess whether the constitutional right in question was "clearly established" at the time the defendant acted. Pearson, 555 U.S. 231-32; Saucier, 533 U.S. at 201-02. The Supreme Court has instructed that a right is clearly established for purposes of qualified immunity if a reasonable state actor under the circumstances would understand that his conduct violates that right. Williams, 455 F.3d at 191 (citing Saucier, 533 U.S. at 202).

In order to find that a right is clearly established, "the right allegedly violated must be defined at the appropriate level of specificity." Wilson, 526 U.S. at 615. The Supreme Court has explained that, at least in some cases, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not]

previously been held unlawful." Hope v. Pelzer, 536 U.S. 730, 741 (2002) (quoting United States v. Lanier, 520 U.S. 259, 271 (1997) (internal quotation marks and citation omitted)). In some cases, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Wilson, 455 F.3d at 191 (quoting Hope, 536 U.S. at 741).

The court is no longer required to conduct these two inquiries sequentially, Pearson, 555 U.S. at 236, and it may forego difficult constitutional issues and award qualified immunity to a defendant if it is apparent that the defendant did not violate rights that were clearly established at the time the defendant acted. Id. Where a court elects to address the alleged constitutional violations, however, the court's analysis of the merits for purposes of summary judgment merges with analysis of the deprivation of federal rights for purposes of qualified immunity. Gruenke v. Seip, 225 F.3d 290, 299-300 (3d Cir. 2000); Crouse, 668 F. Supp. 2d at 671; see also Grant v. City of Pittsburgh, 98 F.3d 116, 122 (3d Cir. 1996) ("[C]rucial to the resolution of [the] assertion of qualified immunity is a careful examination of the record . . . to establish . . . a detailed factual description of the actions of each individual defendant (viewed in a light most favorable to the plaintiff).") Because qualified immunity entails a consideration of whether the law was clearly established at the time of a defendant's conduct, this defense, which focuses on the state of the law, presents a

question of law for the court, and one which can often be resolved on summary judgment.  See <u>Montanez v. Thompson</u>, 603 F.3d 243 (3d Cir. 2010).

Given the state of the law in this field, which has consistently rebuffed inmate property confiscation and access to courts claims like those presented here by Ball, the defendants simply could not have recognized that their actions would violate "clearly established statutory or constitutional right[] of which a reasonable person would have known."  <u>Wilson v. Layne</u>, 526 U.S. 603, 609 (1999).  Therefore, the defendants are entitled to qualified immunity on these claims.

In sum, then, this merits analysis reveals that Ball's complaint fails on its merits.  Therefore, we find that all of the <u>Poulis</u> factors call for dismissal of this case, and for all of the reasons set forth above, we will recommend that the defendants' motion for summary judgment be granted.

## III.    <u>Recommendation</u>

Accordingly, for the foregoing reasons, IT IS RECOMMENDED that the defendant's Summary Judgment Motion (Doc.109.), be GRANTED and the plaintiff's complaint be dismissed.

The Parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file

with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 28th day of February 2013.

*__S/Martin C.  Carlson__*
Martin C. Carlson
United States Magistrate Judge
